[L. A. No. 29632. In Bank. Nov. 20, 1969.]

MARC S. MORRISON, Plaintiff and Appellant, v.
STATE BOARD OF EDUCATION, Defendant and Respondent.

## Counsel

Melville B. Nimmer for Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, Edward M. Belasco and Anthony M. Summers, Deputy Attorneys General, for Defendant and Respondent.

## Opinion

**TOBRINER, J.**—For a number of years prior to 1965 petitioner held a General Secondary Life Diploma and a Life Diploma to Teach Exceptional Children, issued by the State Board of Education, which qualified petitioner for employment as a teacher in the public secondary schools of California. (Ed. Code, §§ 12905, 13251.) On August 5, 1965, an accusation was filed with the State Board of Education charging that petitioner's life diplomas should be revoked for cause. On March 11, 1966, following a hearing, and pursuant to the recommendations of a hearing examiner, the board revoked petitioner's life diplomas because of immoral and unprofessional conduct and acts involving moral turpitude as authorized by section 13202 of the Education Code.[1] This revocation rendered petitioner ineligible for

---

[1] Section 13202 provides: "The State Board of Education shall revoke or suspend for immoral or unprofessional conduct, or for persistent defiance of, and refusal to obey, the laws regulating the duties of persons serving in the Public School System, or for any cause which would ·have warranted the denial of an application for a certification .document or the renewal thereof, or for evident unfitness for service, life diplomas, documents, or credentials issued pursuant to this code." Among the causes warranting denial of such documents is the commission of "any act involving moral turpitude." (Ed. Code, § 13129, subd. (e).)

employment as a teacher in any public school in the state.[2] On February 14, 1967,[3] petitioner sought a writ of mandate from the Superior Court of Los Angeles County to compel the board to set aside its decision and restore his life diplomas. After a hearing the superior court denied the writ, and this appeal followed.

For the reasons hereinafter set forth we conclude (a) that section 13202 authorizes disciplinary measures only for conduct indicating unfitness to teach, (b) that properly interpreted to this effect section 13202 is constitutional on its face and as here applied, and (c) that the record contains no evidence to support the conclusion that petitioner's conduct indicated his unfitness to teach. The judgment of the superior court must therefore be reversed.

## I. *The Facts*

For a number of years prior to 1964 petitioner worked as a teacher for the Lowell Joint School District. During this period, so far as appears from the record, no one complained about, or so much as criticized, his performance as a teacher. Moreover, with the exception of a single incident, no one suggested that his conduct outside the classroom was other than beyond reproach.

Sometime before the spring of 1963 petitioner became friends with Mr. and Mrs. Fred Schneringer. Mr. Schneringer also worked as a teacher in the public school system. To the Schneringers, who were involved in grave marital and financial difficulties at the time, petitioner gave counsel and advice. In the course of such counseling Mr. Schneringer frequently visited petitioner's apartment to discuss his problems. For a one-week period in April, during which petitioner and Mr. Schneringer experienced severe emotional stress, the two men engaged in a limited, non-criminal[4] physical

---

[2]Since the ruling of the state board deprived every local school board of its discretion to decide, upon taking into account special local problems, needs and policies, whether a candidate was fit to teach in its particular area, we must subject the state board's decision to careful scrutiny.

[3]This delay of almost one year in seeking judicial relief apparently resulted from the board's failure to provide petitioner with a copy of the transcript of the December 1965 hearing until February 1967.

[4]Neither sodomy (Pen. Code, § 286), oral copulation (Pen. Code, § 288a), public solicitation of lewd acts (Pen. Code § 647, subd. (a) ), loitering near public toilets (Pen. Code, § 647, subd. (d) ), nor exhibitionism (Pen. Code, § 314) were involved.

Conviction of such offenses would have resulted in the mandatory revocation of all diplomas and life certificates issued by the State Board of Education. (Ed. Code, §§ 12912, 13206, 13207; see also Ed. Code, §§ 13216, 13218, 13255, 13586, and 13742.)

The Education Code thus draws an important distinction between different types of sexual indiscretions by teachers, dealing with such conduct in two different parts of the code. Conviction of certain sex crimes entails automatic dismissal. (Ed. Code,

relationship which petitioner described[5] as being of a homosexual nature. Petitioner has never been accused[6] or convicted of any criminal activity whatever, and the record contains no evidence of any abnormal activities or desires by petitioner since the Schneringer incident some six years in the past. Petitioner and Schneringer met on numerous occasions in the spring and summer after the incident and nothing untoward occurred. When Schneringer later obtained a separation from his wife, petitioner suggested a number of women whom Schneringer might consider dating.

Approximately one year after the April 1963 incident, Schneringer reported it to the Superintendent of the Lowell Joint School District. As a result of that report petitioner resigned his teaching position on May 4, 1964.[7]

Some 19 months after the incident became known to the superintendent, the State Board of Education conducted a hearing concerning possible

§§ 13192, 13206.) But other sexual misconduct results in discipline only if it is "immoral," "unprofessional" or involves "moral turpitude." (Ed. Code, §§ 13202, 13129, subd. (e).) A teacher is entitled to a hearing if charged under section 13202, but not if charged with conviction of a crime under section 13206. *DiGenova* v. *State Board of Education* (1955) 45 Cal.2d 255 [288 P.2d 862].) A rule that homosexual conduct was "immoral" or "unprofessional" per se would obliterate the distinction between criminal convictions and other sexual misconduct, since discipline for immoral or unprofessional conduct is mandatory, and would substantially reduce the significance of the hearing contemplated by statute. (Ed. Code, § 13203.) With regard to the possibility of such a per se rule, moreover, we note that the Assembly subcommittee which proposed sections 12912, 13206, 13207, 13216, 13218, 13255, 13586, and 13742 of the Education Code dealing with sex crimes, questioned whether even persons "convicted of sex offenses" could always be deprived of their teaching credentials under section 13202. (See Report of the Subcommittee on Sex Crimes of the Assembly Interim Committee on Judicial System and Judicial Process, Journal of the Assembly (1952) Second Ex. Sess., pp. 136, 171-175.)

As to whether non-criminal sexual conduct can be "immoral" within the meaning of federal civil service regulations, see *Pelicone* v. *Hodges* (Dist. Col. 1963) 320 F.2d 754, 757 fn. 8 [116 App. D.C. 32]. The federal government apparently takes the position that even criminal sexual behavior is not ground for dismissal unless it is widely regarded as repugnant. (See Note (1969) 82 Harv.L.Rev. 1738, 1742.) In determining whether discipline is authorized and reasonable, a criminal conviction has no talismanic significance. (See, e.g., *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67 [64 Cal.Rptr. 785, 435 P.2d 553]; *Lorenz* v. *Board of Medical Examiners* (1956) 46 Cal.2d 684 [298 P.2d 537]; *In re Hallinan* (1954) 43 Cal.2d 243 [272 P.2d 768].)

[5]Petitioner's candor can hardly be held against him. (Compare *Schware* v. *Board of Bar Examiners* (1957) 353 U.S. 232, 240 [1 L.Ed.2d 796, 802, 77 S.Ct. 752, 64 A.L.R.2d 288].)

[6]Concerning the probative value of an arrest as to moral character, see *Schware* v. *Board of Bar Examiners, supra,* 353 U.S. 232, 241-243 [1 L.Ed.2d 796, 802-804, 77 S.Ct. 752, 64 A.L.R.2d 288].)

[7]Petitioner does not allege that his resignation was obtained by duress, menace, fraud, mistake or undue influence. (Compare *Odorizzi* v. *Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 127 [54 Cal.Rptr. 533].)

revocation of petitioner's life diplomas. Petitioner there testified that he had had some undefined homosexual problem at the age of 13, but that, with the sole exception of the Schneringer incident, he had not experienced the slightest homosexual urge or inclination for more than a dozen years. Mr. Cavalier, an investigator testifying for the board, stated that the Schneringer incident "was the only time that [petitioner] ever engaged in a homosexual act with anyone." No evidence was presented that petitioner had ever committed any act of misconduct whatsoever while teaching.

The Board of Education finally revoked petitioner's life diplomas some three years after the Schneringer incident. The board concluded that that incident constituted immoral and unprofessional conduct, and an act involving moral turpitude, all of which warrant revocation of life diplomas under section 13202 of the Education Code.

II. *Petitioner's actions cannot constitute immoral or unprofessional conduct or conduct involving moral turpitude within the meaning of section 13202 unless those actions indicate his unfitness to teach.*

Section 13202 of the Education Code authorizes revocation of life diplomas for "immoral conduct," "unprofessional conduct," and "acts involving moral turpitude." Legislation authorizing disciplinary action against the holders of a variety of certificates, licenses and government jobs other than teaching[8] also contain these rather general terms. This court has not attempted to formulate explicit definitions of those terms which would apply to all the statutes in which they are used. (See *Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, 73.) Rather, we have given those terms more precise meaning by referring in each case to the particular profession or the specific governmental position to which they were applicable.[9]

---

[8] See pp. 227-228, *infra.*

[9] Our approach to section 13202 is similar to that taken recently by the United States Court of Appeals for the District of Columbia in *Norton* v. *Macy* (D. C. Cir. 1969) 417 F.2d 1161, 1165: "[W]e reject [the Civil Service Commission's] contention that once the label 'immoral' is plausibly attached to an employee's off-duty conduct, our inquiry into the presence of adequate rational cause for removal is at an end. A pronouncement of 'immorality' tends to discourage careful analysis because it unavoidably connotes a violation of divine, Olympian, or otherwise universal standards of rectitude."

Under the interpretations given to the terms "immoral conduct," "unprofessional conduct," and "moral turpitude," these terms substantially overlap one another. They also cover much the same conduct as "evident unfitness for service," which is also a ground for revocation of certificates under section 13202. We noted such redundancy in *Board of Education* v. *Swan* (1953) 41 Cal.2d 546, 551 [261 P.2d 261].) (See also *Board of Education* v. *Weiland* (1960) 179 Cal.App.2d 808 [4 Cal.Rptr. 286].) This overlap has also been recognized by the Legislature, which has, for example, provided in various contexts that unprofessional conduct includes both gross immorality (Bus. & Prof. Code, §§ 1680, 2361, 3105, and 4350.5, subd. (a)) and acts involving moral turpitude (Bus. & Prof. Code, § 4350.5, subd. (e)). A recent study

In *Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447 [55 Cal.Rptr. 228, 421 P.2d 76], for example, we considered the meaning of "acts of moral turpitude" as applied to an applicant for admission to practice law. (See 65 Cal.2d at pp. 452, 461.) In that case the applicant had been arrested and convicted of a number of minor offenses in connection with peace demonstrations and civil rights "sit ins"; he had likewise been involved in a number of fistfights. We held that the applicant could not be denied admission to the bar. The nature of these acts, we ruled, "does not bear a direct relationship to petitioner's fitness to practice law. Virtually all of the admission and disciplinary cases in which we have upheld decisions of the State Bar to refuse to admit applicants or to disbar, suspend, or otherwise censure members of the bar have involved acts which bear upon the individual's manifest dishonesty and thereby provide a reasonable basis for the conclusion that the applicant or attorney cannot be relied upon to fulfill the moral obligations incumbent upon members of the legal profession [citations] . . . . Although petitioner's past behavior may not be praiseworthy it does not reflect upon his honesty and veracity *nor does it show him unfit for the proper discharge of the duties of an attorney.*" (Italics added.) (*Hallinan* v. *Committee of Bar Examiners, supra,* 65 Cal.2d 447, 471-472; compare *Schware* v. *Board of Bar Examiners, supra,* 353 U.S. 232.)[10]

---

stated: "Throughout the hearings, specific examples of 'unprofessional conduct' were cited. The committee believes, however, that in every case, the charges could have been subsumed under one or another of the specific charges contained in Section 13403 [relating to dismissal of permanent teachers] such as dishonesty, incompetency or evident unfitness for service. No cases were brought to the committee's attention which clearly required the use of an undefined category such as "unprofessional conduct.' " (Report of the Subcommittee on Personnel Problems of the Assembly Interim Committee on Education, Appendix to the Journal of the Assembly (1965) vol. 2, p. 26.) Discussing the meaning of "moral turpitude," Justice Jackson has written, "If we go to the dictionaries, the last resort of the baffled judge, we learn little except that the expression is redundant, for turpitude alone means moral wickedness or depravity and moral turpitude seems to mean little more than morally immoral." (*Jordan* v. *De George* (1951) 341 U.S. 223, 234 [95 L.Ed. 886, 893, 71 S. Ct. 703] (dissenting opinion).)

[10]In *In re Rothrock* (1940) 16 Cal.2d 449, 455 [106 P.2d 907, 131 A.L.R. 226], we indicated that acts do not involve "moral turpitude" warranting disbarment, etc., unless those acts are "such that it may fairly be inferred that . . . [the attorney's] moral character is . . . such as will probably lead him into an abuse of the privileges of his profession, or a disregard of his duties either to the court or to his clients." (See also *In re Gorsuch* (1956) 76 S.D. 191 [75 N.W.2d 644, 648, 57 A.L.R.2d 1355] ("[A] lawyer should so conduct himself that the work of the Courts and the administration of justice will not suffer by reason of his continuing to hold a license to practice. This does not mean that the Court has the function or right to regulate the morals, habits or private lives of lawyers, who like other citizens are free to act and to be responsible for their acts, but when the morals, habits or conduct of a lawyer demonstrate *unfitness to practice law* or adversely affect the proper administration of justice, then the Court may have the duty to suspend or revoke the privilege to practice law in order to protect the public." (Italics added.)); *Bartos* v. *United States District Court* (8th Cir. 1927) 19 F.2d 722, 724 ("We take it to be a sound principle that the court has no regulatory power over the private life of members

In *Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, we were also concerned with moral turpitude. In that case a doctor had been convicted of nine counts of violation of section 4227 of the Business and Professions Code (furnishing dangerous drugs without prescription), and the Board of Medical Examiners had revoked his medical certificate. The superior court reversed the board's action; we upheld that court's disposition of the matter, stating, inter alia, "The purpose of an action seeking revocation of a doctor's certificate is not to punish the doctor but rather to protect the public. . . . [Citations.] While revocation of a certificate certainly works an unavoidable punitive effect, the board can seek to achieve a legitimate punitive purpose only through criminal prosecution. *Thus, in this proceeding the inquiry must be limited to the effect of Dr. Yakov's actions upon the quality of his service to his patients.*" (Italics added.) (*Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, 73, fn. 6.)[11]

*Board of Education* v. *Swan* (1953) 41 Cal.2d 546 [261 P.2d 261], and *Board of Trustees* v. *Owens* (1962) 206 Cal.App.2d 147 [23 Cal.Rptr. 710], dealt with the term "unprofessional conduct" as applied to teachers. In *Swan* we stressed: "One employed in public service does not have a constitutional right to such employment and is subject to reasonable supervision and restriction by the authorized governmental body or officer *to the end that proper discipline may be maintained, and that activities among the employees may not be allowed to disrupt or impair the public service.*" (Italics added.) (41 Cal.2d 546, 556.)[12] In *Owens* the Court of

---

of the Bar, and that it cannot exclude them from practice for acts in that capacity unless they be such as to clearly demonstrate their *unfitness* to longer enjoy the privileges of the profession." (Italics added.)); *State* v. *McClaugherty* (1889) 33 W.Va. 250 [10 S.E. 407, 410] ("it would be carrying the doctrine [requiring good moral character] too far to hold that an attorney must be free from every vice, and to strike him from the roll of attorneys because he may indulge in irregularities affecting to some extent his moral character, when such delinquencies do not affect his personal or professional integrity. To warrant a removal, his character must be bad in such respects as show him to be unsafe and unfit to be entrusted with the powers and duties of his profession."); *In re Dampier* (1928) 46 Idaho 195 [267 P. 452]; *People* v. *Smith* (1919) 290 Ill. 241 [124 N.E. 807, 808, 9 A.L.R. 183]; Note (1958) 43 Cornell L.Q. 489, 493-494 ("Despite the strictness with which the bar purges those who demonstrate unfitness by immoral or unethical conduct, generally there is no disbarment for private vices. Gambling, temper and abusive language, frequenting a disorderly house, have all been held not grounds for disbarment . . . . The . . . defenses that would appear to exonerate a lawyer and save him from disciplinary action are that he did not commit the act charged or that the act is not indicative of *unfitness.*" (Italics added.)

[11]Thus in *Fort* v. *City of Brinkley* (1908) 87 Ark. 400 [112 S.W. 1084], the Arkansas Supreme Court held that the illegal sale of intoxicants did not involve the sort of "moral turpitude" required for the revocation of a license to practice medicine.

[12]In *Swan* we detailed some of the many responsibilities of a teacher, quoting extensively from *Goldsmith* v. *Board of Education* (1924) 66 Cal.App. 157 [255 P. 783]. (*Board of Education* v. *Swan, supra,* 41 Cal.2d 546, 553-554.) The quota-

Appeal held that in deciding whether certain conduct by a teacher constituted unprofessional conduct which warranted discipline, a trial court must inquire whether that conduct had produced "any disruption or impairment of discipline or the teaching process . . . ." (206 Cal.App.2d 147, 157.)

In *Orloff* v. *Los Angeles Turf Club, Inc.* (1951) 36 Cal.2d 734 [227 P.2d 449], we dealt with a statute authorizing the exclusion from theaters, museums, and race courses of persons of "immoral character." We reasoned that the objective of the statute was "the protection of others on the premises." (*Id.* at p. 740.) Accordingly we held that a person might be excluded if, for example, he committed a lewd act or an act inimical to the public safety or welfare after gaining admittance to the place of entertainment. But we stressed that no sweeping inquiry could be made into the background and reputation of each person seeking admission. "[T]he private business, the personal relations with others, the past conduct not on the premises, of a person applying for or admitted to the [race] course, whether or not relevant to indicate his character, are immaterial in the application of the statutory standards . . . ." (*Orloff* v. *Los Angeles Turf Club, Inc, supra,* 36 Cal.2d 734, 741.)[13]

In *Jarvella* v. *Willoughby-Eastlake City School Dist.* (1967) 12 Ohio Misc. 288, 41 Ohio Ops.2d 423 [233 N.E.2d 143], the court faced the issue of whether a teacher could be dismissed for "immorality" merely because he

---

tion in *Swan,* however, deliberately omitted some overly broad language used in *Goldsmith,* as indicated by the italics in the following passage from *Goldsmith* used in part in *Swan.* "[T]he calling [of the teacher] is so intimate, its duties so delicate, the things in which a teacher might prove unworthy or would fail are so numerous that they are incapable of enumeration in any legislative enactment. *The intimate personal life and habits of a physician or dentist do not necessarily affect his usefulness; he deals with adult persons or children under his protection. But* the teacher is entrusted with the custody of children and their high preparation for useful life." (*Goldsmith* v. *Board of Education, supra,* 66 Cal.App. 157, 168; compare *Board of Education* v. *Swan,* 41 Cal.2d 546, 553.)

[13] In *H. D. Wallace & Associates* v. *Department of Alcoholic etc. Control* (1969) 271 Cal.App.2d 589 [76 Cal.Rptr. 739], the department revoked the liquor license of a man convicted of drunk driving, public drunkenness, and driving without a license, on the ground that a continuation of the license would be contrary to public welfare and morals. In reversing the department's action, the court stated, "In this case the department apparently believed that Mr. Hughes' past conduct might raise a future problem. The net effect was revocation of the license upon conjecture or speculation. There was no evidence that his convictions for insobriety on and off the highway had an actual effect upon the conduct of the licensed business, nor was there any rational relationship between his offenses and the operation of the licensed business in a manner consistent with public welfare and morals." (271 Cal.App. 2d 589, 593.)

had written a private letter to a friend containing language which some adults might find vulgar and offensive. The court held that Ohio Revised Code section 3319.16, authorizing dismissal for "immorality," did not cover the teacher's actions, and that he could not therefore be dismissed. The court explained, "Whatever else the term 'Immorality' may mean to many, it is clear that when used in a statute it is inseparable from 'conduct' . ... But it is not 'immoral conduct' considered in the abstract. It must be considered in the context in which the Legislature considered it, as conduct which is hostile to the welfare of the general public; more specifically in this case, conduct which is hostile to the welfare of the school community. . . . In providing standards to guide school boards in placing restraints on conduct of teachers, the Legislature is concerned with the welfare of the school community. Its objective is the protection of students from corruption. This is a proper exercise of the power of a state to abridge personal liberty and to protect larger interests. But reasonableness must be the governing criterion. . . . *Orloff* v. *Los Angeles Turf Club, Inc.* 36 Cal.2d 734 . . . . The private conduct of a man, who is also a teacher, is a proper concern to those who employ him only to the extent it mars him as a teacher . . . . Where his professional achievement is unaffected, where the school community is placed in no jeopardy, his private acts are his own business and may not be the basis of discipline." (233 N.E.2d 143, 145-146.)[14]

By interpreting these broad terms to apply to the employee's performance on the job, the decisions in *Hallinan, Yakov, Swan, Owens, Orloff* and *Jarvella* give content to language which otherwise would be too sweeping to be meaningful. Terms such as "immoral or unprofessional conduct" or "moral turpitude" stretch over so wide a range that they embrace an

---

[14]Applying the *Jarvella* approach in *Hale* v. *Board of Education, City of Lancaster* (1968) 13 Ohio St.2d 92, 42 Ohio Ops.2d 286 [234 N.E.2d 583], the court held that a teacher could not be dismissed for "immorality" merely because he had been convicted of leaving the scene of an automobile accident without stopping and furnishing certain required information. In *School Dist. of Ft. Smith* v. *Maury* (1890) 53 Ark. 471 [14 S.W. 669], the court, in upholding the power of school officials to discharge teachers for immorality, cautioned, "We do not mean to say that every act of immorality would be a breach of the contract to justify termination, but it would be such whenever, from the character or notoriety of the act, it impaired the services of the teacher in properly instructing or advancing the pupils." The same "rational connection" requirement applicable to the dismissal of a teacher would presumably apply to the suspension or expulsion of a student. (Compare *Myers* v. *Arcata etc. School Dist.* (1969) 269 Cal.App.2d 549 [75 Cal.Rptr. 68]; see A.B. 1760 (1968).)

An approach similar to our own was taken by the court in *Norton* v. *Macy, supra,* 417 F.2d 1161, 1165-1166: "[A] finding that an employee has done something immoral or indecent could support a dismissal without further inquiry only if [the] immoral or indecent acts of an employee have some ascertainable deleterious effect on the efficiency of the service. . . . the sufficiency of the charges against [the employee] must be evaluated in terms of the effects on the service of what in particular he has done or has been shown likely to do."

unlimited area of conduct. In using them the Legislature surely did not mean to endow the employing agency with the power to dismiss any employee whose personal, private conduct incurred its disapproval. Hence the courts have consistently related the terms to the issue of whether, when applied to the performance of the employee on the job, the employee has disqualified himself.

In the instant case the terms denote immoral or unprofessional conduct or moral turpitude of the teacher which indicates unfitness to teach. Without such a reasonable interpretation the terms would be susceptible to so broad an application as possibly to subject to discipline virtually every teacher in the state.[15] In the opinion of many people laziness, gluttony, vanity, selfishness, avarice, and cowardice constitute immoral conduct. (See Note (1967) 14 U.C.L.A. L.Rev. 581, 582.) A recent study by the State Assembly reported that educators differed among themselves as to whether "unprofessional conduct" might include "imbibing alcoholic beverages, use of tobacco, signing petitions, revealing contents of school documents to legislative committees, appealing directly to one's legislative representative, and opposing majority opinions . . . . " (Report of the Subcommittee on Personnel Problems of the Assembly Interim Committee on Education, Appendix to the Journal of the Assembly, *supra* (1965) vol. 2, p. 25.) We cannot believe that the Legislature intended to compel disciplinary measures against teachers who committed such peccadillos if such passing conduct did not affect students or fellow teachers. Surely incidents of

---

[15]A sweeping provision purporting to penalize or sanction so large a group of people as to be incapable of effective enforcement against all or even most of them necessarily might offend due process. Such a statute, unless narrowed by clear and well-known standards, affords too great a potential for arbitrary and discriminatory application and administration. (See *United States* v. *Reese* (1875) 92 U.S. 214, 221 [23 L.Ed. 563, 565] ("It would certainly be dangerous if the Legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."); H.L.A. Hart, Law, Liberty and Morality (1963) p. 27.) In *Norton* v. *Macy, supra*, 417 F.2d 1161, 1165, the United States Civil Service Commission defined "immorality" as a violation of "the prevailing mores of our society." The court commented, "So construed, 'immorality' covers a multitude of sins. Indeed, it may be doubted whether there are in the entire Civil Service many persons so saintly as never to have done any act disapproved by the 'prevailing mores of our society.' " With regard to the feasibility of a ban on all persons with any sort of homosexual background, the court argued, "The most widely accepted study of American sexual practices estimates that 'at least 37 per cent' of the American male population have at least one homosexual experience during their lifetime. Kinsey, Pomeroy & Martin, Sexual Behavior in the Human Male 623 (1948). If this is so, a policy excluding all persons who have engaged in homosexual conduct from government employ would disqualify for public service over one-third of the male population. This result would be both inherently absurd and devastating to the public service." (417 F.2d 1161, 1167, fn. 28. Compare *Boutilier* v. *Immigration Service* (1967) 387 U.S. 118, 129-130 [18 L.Ed.2d 661, 668-669, 87 S.Ct. 1563] (Douglas, J., dissenting); Newsweek (February 13, 1967) p. 63 (remarks of Vicar Robert Cromey).)

extramarital heterosexual conduct against a background of years of satisfactory teaching would not constitute "immoral conduct" sufficient to justify revocation of a life diploma without any showing of an adverse effect on fitness to teach.[16]

Nor is it likely that the Legislature intended by section 13202 to establish a standard for the conduct of teachers that might vary widely with time, location, and the popular mood. One could expect a reasonably stable consensus within the teaching profession as to what conduct adversely affects students and fellow teachers. No such consensus can be presumed about "morality." "Today's morals may be tomorrow's ancient and absurd customs." (Note, *supra*, 14 U.C.L.A. L.Rev. 581, 587.)[17] And conversely, conduct socially acceptable today may be anathema tomorrow. Local boards of education, moreover, are authorized to revoke their own certificates and dismiss permanent teachers for immoral and unprofessional conduct (Ed. Code, §§ 13209, 13403); an overly broad interpretation of that authorization could result in disciplinary action in one county for conduct treated as permissible in another. (See Report of the Subcommittee on Personnel Problems of the Assembly Interim Committee on Education, Appendix to the Journal of the Assembly (1965) vol. 2, p. 25.)[18] A more constricted interpretation of "immoral," "unprofessional,"

---

[16]For examples of cases in which extramarital heterosexual conduct was held not to warrant disbarment, dismissal, or denial of naturalization, see, e.g., *Pelicone* v. *Hodges, supra,* 320 F.2d 754, 757, fn. 8 [116 App. D.C. 32]; *Posusta* v. *United States* (2d Cir. 1961) 285 F.2d 533; *Schmidt* v. *United States* (2d Cir. 1949) 177 F.2d 450; *In re Sotos' Petition* (W.D. Pa. 1963) 221 F.Supp. 145; *In re Naturalization of Denessy* (D.Del. 1961) 200 F.Supp. 354; *In re Naturalization of Odeh* (E.D.Mich. 1960) 185 F.Supp. 953; *In re Kielblock's Petition* (S.D.Cal. 1958) 163 F.Supp. 687; *State* v. *Byrkett* (1895) 4 Ohio 89, 3 Ohio N.P. 28, 9 A.L.R. 202; *Re H—— T——* (Pa. 1882) 2 Pennyp. 84, 9 A.L.R. 202; Note, *supra,* 82 Harv.L.Rev. 1738, 1742; Shapiro, *Morals and the Courts: The Reluctant Crusaders* (1961) 45 Minn.L.Rev. 897, 909-910, 927. But see New York Times (April 4, 1969) p. 30, col. 6.)

[17]See *In re Hatch* (1937) 10 Cal.2d 147, 151 [73 P.2d 885]; *Hewitt* v. *State Board of Medical Examiners* (1906) 148 Cal. 590, 594 [84 P. 39, 113 Am.St.Rep. 315, 7 Ann.Cas. 750, 3 L.R.A. N.S. 896]; *Ex parte Jackson* (1885) 45 Ark. 158, 164; Note (1956) 44 Cal.L.Rev. 403, 407. Although, for example, a recent survey indicated that Americans opposed homosexual law reform by a margin of more than two to one, in England the portion of the population favoring such reform rose from 38 percent to 63 percent in a mere eight years. (Council on Religion and the Homosexual et al., The Challenges and Progress of Homosexual Law Reform (1968) pp: 8, 13, 14 (hereinafter cited as Challenge).) Although the United States Civil Service Commission presently refuses federal employment to homosexuals, a spokesman for the commission has predicted that the commission will permit hiring of homosexuals "as soon as the general public comes to view them without repugnance." (Note, *supra,* 82 Harv.L.Rev. 1738, 1742.)

[18]In criticizing a Utah statute prohibiting conspiracies "to commit any act injurious to . . . public morals," the United States Supreme Court argued, "In some States the phrase 'injurious to public morals' would be likely to punish acts which it would not punish in others because of the varying policies on such matters as use of cigarettes

and "moral turpitude" avoids these difficulties, enabling the State Board of Education to utilize its expertise in educational matters rather than having to act "as the prophet to which is revealed the state of morals of the people or the common conscience." (Note (1935) 24 Cal.L.Rev. 9, 22.)[19]

That the meaning of "immoral," "unprofessional," and "moral turpitude" must depend upon, and thus relate to, the occupation involved finds further confirmation in the fact that those terms are used in a wide variety of contexts. Along with public school teachers, all state college employees (Ed. Code, § 24306, subd. (a)), all state civil service workers (Gov. Code, § 19572, subd. (1)), and all barbers (Bus. & Prof. Code, § 6582)[20] can be disciplined for "immoral conduct."[21] The prohibition against "acts involv-

---

or liquor and the permissibility of gambling." (*Musser* v. *Utah* (1948) 333 U.S. 95, 97 [92 L.Ed. 562, 565, 68 S.Ct. 397].) In declaring void for vagueness a prohibition against keeping a place for "immoral purposes," the Louisiana Supreme Court stated, "Since that which might be considered 'immoral' in one locality or section of this state might not be deemed 'immoral' in another locality or section, in any given case it is left to the court of the particular locality to determine and decide what constitutes and is an 'immoral purpose.'" (*State* v. *Truby* (1947) 211 La. 178 [29 So.2d 758, 765]. See also *Jordan* v. *De George, supra,* 341 U.S. 223, 238 [95 L.Ed. 886, 895, 71 S.Ct. 703] (Jackson, J., dissenting); *In re Newbern* (1960) 53 Cal.2d 786, 797 [3 Cal.Rptr. 364, 350 P.2d 116]; Note (1959) 34 Notre Dame Law. 375, 379-380.)

[19]The problem of ascertaining the appropriate standard of "morality" was aptly put in Note, *supra,* 14 U.C.L.A. L.Rev. 581, 582 and footnote 4. "[I]n a secular society—America today—there may be a plurality of moralities. Whose morals shall be enforced? . . . There is a tendency to say that public morals should be enforced. But that just begs the question. Whose morals are the public morals?" (See also *Musser* v. *Utah, supra,* 333 U.S. 95, 97; *In re Naturalization of Denessy, supra,* 200 F.Supp. 354, 358-359; *Schmidt* v. *United States, supra,* 177 F.2d 450, 451; *State* v. *Musser* (1950) 118 Utah 537 [223 P.2d 193, 195] (Latimer, J., concurring); *State* v. *Vallery* (1948) 212 La. 1095 [34 So.2d 329, 331]; Shapiro, *Morals and the Courts: The Reluctant Crusaders, supra,* 45 Minn.L.Rev. 897, 912-922, 936-939; *Note, supra,* 34 Notre Dame Law. 375, 378-383; Note (1953) 66 Harv.L.Rev. 498, 510-512.) For a detailed discussion of this question, which conjures up the implausible spectre of periodic public opinion polls to interpret statutes, see Cohen, Robson and Bates, *Ascertaining the Moral Sense of the Community* (1955) 8 J. Legal Ed. 137. For a discussion of the surprisingly fine distinctions drawn by the United States Civil Service Commission as to what forms of homosexual and heterosexual conduct are and are not "immoral," see Note, *supra,* 82 Harv.L.Rev. 1738, 1742.

[20]"It is difficult to see how the public welfare is furthered by preventing a barber from cutting hair because his personal behavior is at variance with the generally accepted views of society." (Note (1962) 14 Stan.L.Rev. 533, 548-549. Compare *Barsky* v. *University of New York* (1954) 347 U.S. 442, 472, 474 [98 L.Ed. 829, 849, 850, 74 S.Ct. 650] (Douglas, J., dissenting); see A. Cory, The Homosexual in America (1951) pp. 38-39.)

[21]Two other prohibitions not applied to public school teachers are found in similar regulations of other professions. "Gross immorality" constitutes ground for disciplinary measures against doctors (Bus. & Prof. Code, § 2361, subd. (d)), dentists (Bus. & Prof. Code, § 1680, subd. (8)), optometrists (Bus. & Prof. Code, § 3105), pharmacists (Bus. & Prof. Code, § 4350.5, subd. (a)), funeral directors and embalmers (Bus. & Prof. Code, § 7698) and guardians (Prob. Code, § 1580, subd. (4)).

ing moral turpitude" applies to attorneys (Bus. & Prof. Code, § 6106) and to technicians, bioanalysts and trainees employed in clinical laboratories (Bus. & Prof. Code, § 1320), as well as to teachers. The ban on "unprofessional conduct" is particularly common, covering not only teachers, but also dentists (Bus. & Prof. Code, § 1670), physicians (Bus. & Prof. Code, § 2361), vocational nurses (Bus. & Prof. Code, § 2878, subd. (a)), optometrists (Bus. & Prof. Code, § 3090), pharmacists (Bus. & Prof. Code, § 4350), psychiatric technicians (Bus. & Prof. Code, § 4521, subd. (a)), employment agency officials (Bus. & Prof. Code, § 9993), state college employees (Ed. Code, § 24306, subd. (b)), certified shorthand reporters (Bus. & Prof. Code, § 8025), and funeral directors and embalmers (Bus. & Prof. Code, § 7707). Surely the Legislature did not intend that identical standards of probity should apply to more than half a million[22] professionals and government employees in widely varying fields without regard to their differing duties, responsibilities, and degree of contact with the public.[23]

---

Although we reiterate that petitioner was not convicted of any crime, we note that the most common basis for revocation of licenses and certificates is conviction of a crime involving moral turpitude. Among those covered by such a provision are trainers of guide dogs for the blind (Bus. & Prof. Code, § 7211.9, subd. (d)), chiropractors (Bus. & Prof. Code, § 1000-1010), laboratory technicians and bioanalysts (Bus. & Prof. Code, § 1320, subd. (k)), dentists (Bus. & Prof. Code, § 1679), doctors (Bus. & Prof. Code, § 2361, subd. (e)), physical therapists (Bus. & Prof. Code, § 2660, subd. (d)), registered nurses (Bus. & Prof. Code, § 2761, subd (f)), vocational nurses (Bus. & Prof. Code, § 2878, subd. (f)), psychologists (Bus. & Prof. Code, § 2960, subd. (a)), optometrists (Bus. & Prof. Code § 3094), pharmacists (Bus. & Prof. Code, § 4354), psychiatric technicians (Bus. & Prof. Code, § 4521, subd. (f)), veterinarians (Bus. & Prof. Code, § 4882, subd. (b)), attorneys (Bus. & Prof. Code, § 6101), barbers (Bus. & Prof. Code, § 6576), engineers (Bus. & Prof. Code, § 6775, subd. (a)), collection agency officials (Bus. & Prof. Code, § 6930), private detectives (Bus. & Prof. Code, § 7551, subd. (d)), shorthand reporters (Bus. & Prof. Code, § 8025, subd. (a)), geologists (Bus. & Prof. Code, § 7860, subd. (a)), social workers (Bus. Prof. Code, § 9028, subd. (a)), and employment agency officials (Bus. & Prof. Code, § 9993, subd. (e)).

A particular sexual orientation might be dangerous in one profession and irrelevant to another. Necrophilism and necrosadism might be objectionable in a funeral director or embalmer, urolagnia in a laboratory technician, zooerastism in a veterinarian or trainer of guide dogs, prolagnia in a fireman, undinism in a sailor, or dendrophilia in an arborist, yet none of these unusual tastes would seem to warrant disciplinary action against a geologist or shorthand reporter.

[22]See Statistical Abstract of the United States (1968) pp. 67, 76, 117, 155, 228, 430, 776; Report of the Senate Interim Committee on Licensing Business and Professions, Appendix to the Journal of the Senate (1955) vol. 2, pp. 20-21.

[23]The trend in recent legislation is toward more careful and precise drafting to minimize the danger of the imposition of disciplinary measures for acts unrelated to the profession involved. (See Bus. & Prof. Code, §§ 1320, subd. (k), 2555.1, 5100, 5577, 5675, 6775, 7123, 8025, 8649, 8780, 9727; Report of the Senate Interim Committee on Licensing Business and Professions, Appendix to the Journal of the Senate (1955) vol, 2, pp. 28-29, 38-39, 63; Report of the Subcommittee on Personnel

■ We therefore conclude that the Board of Education cannot abstractly characterize the conduct in this case as "immoral," "unprofessional," or "involving moral turpitude" within the meaning of section 13202 of the Education Code unless that conduct indicates that the petitioner is unfit to teach. In determining whether the teacher's conduct thus indicates unfitness to teach the board may consider such matters as the likelihood that the conduct may have adversely affected students or fellow teachers, the degree of such adversity anticipated, the proximity or remoteness in time of the conduct,[24] the type of teaching certificate held by the party involved,[25] the extenuating or aggravating circumstances, if any, surrounding the conduct,[26] the praiseworthiness or blameworthiness of the motives resulting in the conduct,[27] the likelihood of the recurrence of the questioned conduct, and the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers.[28] ■ These factors are relevant to the

---

Problems of the Assembly Interim Committee on Education, Appendix to the Journal of the Assembly (1965) vol. 2, p. 25.)

[24]See *Schware* v. *Board of Bar Examiners, supra,* 353 U.S. 232, 240-247 [1 L.Ed.2d 796, 802-806, 77 S.Ct. 752, 64 A.L.R.2d 288]; *Bowman* v. *Ray* (1904) 118 Ky. 110 [80 S.W. 516, 517].

[25]The Education Code authorizes a wide variety of teaching credentials involving differing degrees and types of relationships with students of differing ages. These include the standard elementary school credential (§§ 13189, 13189.5, 13190), the standard secondary school credential (§§ 13191, 13192), the standard junior college credential (§§ 13193, 13194), the standard designated subject credential (§ 13195), the pupil personnel services credential (§ 13196), the health services credential (§ 13197), the teacher supervision credential (§ 13197.1), the administration credential (§ 13197.2), the librarian credential (§§ 13188, 13197.55), and credentials to teach exceptional children (§§ 13188 and 13197.55) and foreign languages (§ 13197.8).

Concerning the possibility that a teacher might be disqualified for certain types of work but not others, note the action taken by school officials in *Finot* v. *Pasadena City Board of Education* (1967) 250 Cal.App.2d 189 [58 Cal.Rptr. 520]; *Board of School Directors of School Dist.* v. *Gillies* (1942) 343 Pa. 382 [23 A.2d 447, 448]; Note, *supra,* 82 Harv.L.Rev. 1738, 1745. Compare *Norton* v. *Macy, supra,* 417 F.2d 1161, 1166 & fn. 21.

[26]Compare Government Code sections 11506, subdivision (d), 11520, subdivision (b); Business and Professions Code sections 2383, 4354, 4521, subdivision (f).

The board's discretion to consider remorse for misconduct does not include a right to revoke a teacher's certificate because he happens to disagree with the board as to the morality of any particular type of conduct. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." (*Schware* v. *Board of Bar Examiners, supra,* 353 U.S. 232, 244-245, fn. 15 [1 L.Ed.2d 796, 804-805, 77 S.Ct. 752, 64 A.L.R.2d 288], quoting *West Virginia State Board* v. *Barnette* (1943) 319 U.S. 624, 642 [87 L.Ed. 1628, 1639, 63 S.Ct. 1178, 147 A.L.R. 674].)

[27]See *Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, 73-74; *Kemp* v. *Board of Medical Supervisors* (1917) 46 App. D.C. 173, 182.

[28]Since the record contains no evidence that the instant matter received any publicity prior to the board's action, we express no opinion as to when, if ever, a teacher

extent that they assist the board in determining whether the teacher's fitness to teach, i.e., in determining whether the teacher's future classroom performance and overall impact on his students are likely to meet the board's standards.

III. *If interpreted in this manner section 13202 can be constitutionally applied to petitioner.*

Petitioner urges three substantive reasons to support his contention that section 13202 upon its face or as construed by the board deprived him of his constitutional rights. As we shall show, however, that section, as we have interpreted it, could constitutionally apply to petitioner.

Petitioner first suggests that the terms "unprofessional," "moral turpitude," and particularly "immoral" are so vague as to constitute a denial of due process.[29]

could be disciplined merely because he persistently and publicly violated important and universally shared community values in such a manner as demonstrably to handicap his relations with, or control over, his students. See *Finot* v. *Pasadena City Board of Education, supra,* 250 Cal.App.2d 189, holding that a teacher could not be disciplined for growing a beard even though his principal believed a beard ignored "common social amenities," was not "acceptable dress and grooming," and did not "set an example of cleanliness, neatness, and good taste." *Jarvella* v. *Willoughby-Eastlake City School Dist., supra,* 233 N.E.2d 143, 146, argued, however, that a teacher could not be disciplined merely because his private conduct had reached public notice through someone else's indiscretion, especially when that someone else was a school official.

[29]The transcript of the hearing held by the hearing officer indicates that the vagueness of these terms left petitioner in grave doubt as to the facts he should establish in order to defend himself.

"MR. MORRISON (Resumes): The questions I have, Mr. Coffman, involves the terminology in sections III and IV of the Accusation. I am asked to respond to the term 'Moral turpitude.' Could you give me some kind of legal definition of what 'moral turpitude' is?

"A. [by Mr. Coffman, counsel for the board called as a witness by petitioner] Well, this is a question. I would object to it as being a question pertaining to argument as to whether your act constitutes 'moral turpitude,' and I will engage in argument subsequent to the submission of this case, that the alleged conduct does constitute [amoral] conduct, but I don't think—I would object to these type of questions.

"HEARING OFFICER: It is sustained. I realize that you are here without counsel. Of course, that is a calculated risk every respondent takes that appears in a proceeding of this kind without counsel, who may not be familiar with the law under which it is being prosecuted. At the same time, counsel for the Department cannot be put on the witness stand and interrogated, as part of the proof of the case, as to his interpretation of the law. So, the objection is sustained.

"MR. COFFMAN: I might add, for Mr. Morrison's benefit, that this is a matter to be determined by the State Board of Education, whether or not your conduct is moral conduct, and involves moral turpitude. It is my opinion—my opinion is not relevant, except that I may argue that it does and you may argue it does not. It is a matter for the Board, and you may feel free to argue it. But, assuming that you admit to certain conduct—I don't know if you do—that it does not involved [*sic*] moral turpitude.

"MR. MORRISON: My whole case revolves around the question of 'what is moral turpitude?' what is involved, and what is 'unprofessional conduct?'

"A. These are terms you can argue to the Hearing Officer and the State Board."

■ Civil as well as criminal statutes must be sufficiently clear as to give a fair warning of the conduct prohibited, and they must provide a standard or guide against which conduct can be uniformly judged by courts and administrative agencies. (*Connelly* v. *General Constr. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126]; *Jordan* v. *De George, supra,* 341 U.S. 223, 231 [95 L.Ed. 886, 892, 71 S.Ct. 703]; *In re Newbern* (1960) 53 Cal. 2d 786, 796 [3 Cal.Rptr. 364, 350 P.2d 116]; Comment (1953) 41 Cal.L.Rev. 523.)[30] The knowledge that he has erred is of little value to the teacher when gained only upon the imposition of a disciplinary penalty that jeopardizes or eliminates his livelihood. (See Note (1964), 15 Hastings L.J. 339, 341.) Courts and commentators[31] have exposed and condemned the uncertainty of words such as "unprofessional,"[32] "immoral,"[33] and "moral turpitude."[34] Indeed, in *Orloff* v. *Los*

[30]An unduly vague statute permits capricious or discriminatory application. In criticizing as vague a criminal prohibition against conspiracy "to commit any act injurious to public health, to public morals, to trade or commerce, or for the perversion or obstruction of justice . . .," the Supreme Court stated, "Standing by itself, it would seem to be warrant for conviction for agreement to do almost any act which a judge and jury might find at the moment contrary to his or her notion of what was good for health, morals, trade, commerce, justice or order." (*Musser* v. *Utah, supra,* 333 U.S. 95, 97 [92 L.Ed. 562, 565]. See *State* v. *Truby, supra,* 29 So.2d 758, 762-767.)

[31]See generally Note, *supra,* 15 Hastings L.J. 339; Note, *supra,* 44 Cal.L.Rev. 403, 405; Note (1929) 43 Harv.L.Rev. 117; Life (June 26, 1964) vol. 56, pp. 66, 74. Compare H.L.A. Hart, Law, Liberty and Morality, *supra,* p. 12. (German statutes of the Nazi period provided that anything was punishable if deserving of punishment according to "the fundamental conceptions of a penal law and sound popular feeling.")

[32]See Report of the Subcommittee on Personnel Problems of the Assembly Interim Committee on Education, Appendix to the Journal of the Assembly (1965) vol. 2, pp. 25-26. Prohibitions against "unprofessional conduct" by licensees have been struck down as void for vagueness in at least four states. *Moore* v. *Vincent* (1935) 174 Okla. 339 [50 P.2d 388] (embalmers); *State* v. *Robinson* (1913) 253 Mo. 271 [161 S.W. 1169, 1174] ("Our learned Attorney General earnestly insists that it was impossible for the General Assembly to designate the numerous acts and things which would constitute 'dishonorable and unprofessional conduct' . . . . We are . . . unwilling to believe that the physicians of our state . . . are guilty of such a multiplicity of wrongful acts that their conduct may not safely be regulated by a single legislative enactment.") *Czarra* v. *Board of Medical Supervisors* (1905) 25 App. D.C. 443 (physicians); *Matthews* v. *Murphy* (1901) 23 Ky. L.R. 750 [63 S.W. 785] (physicians). In *Ex parte McNulty* (1888) 77 Cal. 164, 168 [19 P. 237, 11 Am.St. Rep. 257], we expressed concern over the possibility that an individual might lose substantial rights "for the violation of any vague, undefined notion of unprofessional conduct, which might, after the fact, be entertained by certain individuals constituting a board of examiners."

[33]Note (1966) 66 Colum.L.Rev. 719, 722; Note, *supra,* 15 Hastings L.J. 339; Note, *supra,* 14 Stan.L.Rev. 533, 539, 548-549. In *Musser* v. *Utah, supra,* 333 U.S. 95 [92 L.Ed. 562], the Supreme Court indicated that a state statute punishing conspiracies "to commit any act injurious . . . to public morals" might be void for vagueness unless limited by state courts. On remand the Utah Supreme Court concluded that the statute could not be so limited, and that it was therefore invalid.

*Angeles Turf Club, Inc., supra,* 36 Cal.2d 734, 740, this court recognized that the term "immoral" might well be unconstitutionally vague. (Compare *Konigsberg* v. *State Bar* (1957) 353 U.S. 252, 263 [1 L.Ed.2d 810, 819, 77 S.Ct. 722].

*Orloff* also indicated, however, that such vagueness could be resolved by a more precise judicial construction and application of the statute in conformity with the legislative objectives. (*Id.* at p. 740.) In this manner we upheld in *Orloff* a provision authorizing the exclusion from certain public accommodations of a person of immoral character. We sustained in a similar way the term "unprofessional conduct" against a challenge of vagueness in *Board of Education* v. *Swan, supra,* 41 Cal.2d 546, 553-554.[35] ■ As

Latimer, J., concurring, wrote, "Different courts and different jurors would prescribe different standards and no one would know whether he was a sinner or a saint . . . . In the final analysis, each individual has his own moral codes, private and public, and what acts might be considered as injurious to public morals are as numerous as the opinions of man. The law requires that crimes be defined with more certainty than that." (*State* v. *Musser, supra,* 223 P.2d 193, 195-196.) *State* v. *Vallery, supra,* held void for vagueness a law against intentionally "enticing, aiding, or permitting, by anyone over the age of seventeen, of any child under the age of seventeen, to: . . . Perform any immoral act." (34 So.2d 329.) In *State* v. *Truby, supra,* the Louisiana Supreme Court struck down as vague a prohibition against maintaining a place to be used habitually for any "immoral purpose." (29 So.2d 758, 762-767.) *Ex parte Jackson, supra,* struck down a ban on acts "injurious to the public morals," explaining: "We cannot conceive how a crime can, on any sound principle, be defined in so vague a fashion. Criminality depends, under it, upon the moral idiosyncrasies of the individuals who compose the court and jury. The standard of crime would be ever varying, and the courts would constantly be appealed to as the instruments of moral reform, changing with all fluctuations of moral sentiment." (45 Ark. 158, 164.) In October 1967 the Supreme Court granted certiorari in *Watts* v. *Seward School Board,* 389 U.S. 818 [19 L.Ed.2d 68, 88 S.Ct. 84], which presented the question, inter alia, of whether an Alaska statute authorizing discharge of public school teachers for "immorality" was void for vagueness (see 381 U.S. 126 [14 L.Ed.2d 261, 85 S.Ct. 1321]. In June 1968 the judgment was vacated and the case remanded to the Supreme Court of Alaska (391 U.S. 592 [20 L.Ed.2d 842, 88 S.Ct. 1753]) for reconsideration of the First Amendment problem in that case in the light of *Pickering* v. *Board of Education* (1968) 391 U.S. 563 [20 L.Ed.2d 811, 88 S.Ct. 1731].

[34]*United States* v. *Zimmerman* (E.D.Pa. 1947) 71 F. Supp. 534, 537; Shapiro, *Morals and the Courts: The Reluctant Crusaders, supra,* 45 Minn.L.Rev. 897, 936-938 & fn. 274; Note, *supra,* 14 Stan.L.Rev. 533, 542; Note, *supra,* 15 Hastings L.J. 339; Note, *supra,* 44 Cal.L.Rev. 403, 406; Note, *supra,* 24 Cal.L.Rev. 9.

[35]*Sage-Allen Co.* v. *Wheeler* (1935) 119 Conn. 667 [179 A. 195, 199-200, 98 A.L.R. 897], resolved this problem in a similar manner. "In the sections of the statutes dealing with the grounds upon which a license may be revoked, the Legislature has used language specifically defining certain of them, or has used words having a reasonably certain meaning in the law, but it has then added certain general words such as 'immoral,' 'dishonorable,' or 'unprofessional,' as indicating the character of conduct which is a ground for revoking a license. These words in themselves have no significance in law even to a reasonable certainty and might seem to authorize the revocation of a license for acts having no reasonable relation to the underlying purpose of the statute, the protection of the public. Giving these words a broad meaning, it would be difficult to justify the grant to the board of power to revoke a license for any conduct

we have explained above, the prohibitions against immoral and unprofessional conduct and conduct involving moral turpitude by a teacher constitutes a general ban on conduct which would indicate his unfitness to teach. This construction gives section 13202 the required specificity. Teachers, particularly in the light of their professional expertise, will normally be able to determine what kind of conduct indicates unfitness to teach.[36] Teachers are further protected by the fact that they cannot be disciplined merely because they made a reasonable, good faith, professional judgment in the course of their employment with which higher authorities later disagreed. (See *Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, 74.)[37]

Petitioner secondly contends that the ban on immoral conduct in section 13202 violates his constitutionally protected right to privacy. It is true that an unqualified proscription against immoral conduct would raise serious constitutional problems.[38] Conscientious school officials concerned with

---

which it might deem to be immoral, dishonorable, or unprofessional. [Citations.] But if we did give to these words so broad a meaning, we would be attributing to the Legislature an intent to vest the board with power going beyond the scope of its purposes and to enact a law of at least doubtful constitutionality. We cannot assume that the Legislature intended to give expression to such an intent and must, if it is reasonably possible to do so, so construe the words it has used as to make the provision a valid and reasonable one. [Citations.] The words must have been used in the light of the fundamental purpose of the statutes to regulate the profession in the public interest and they can only be construed as intending to include conduct within their fair purport which either shows that the person guilty of it is intellectually or morally incompetent to practice the profession or has committed an act or acts of a nature likely to jeopardize the interest of the public. So construed, they vest in the board a power it may properly exercise." (See also *Arizona State Board of Medical Examiners* v. *Clark* (1965) 97 Ariz. 205 [398 P.2d 908, 915]; *State* v. *Truby, supra,* 29 So.2d 758, 760-762; *Richardson* v. *Simpson* (1913) 88 Kan. 684 [129 P. 1128, 1130, 43 L.R.A. N.S. 911]; *Aiton* v. *Board of Medical Examiners* (1911) 13 Ariz. 354 [114 P. 962, L.R.A. 1915A 691].)

[36]As thus construed the statute is not unconstitutional on its face. This construction does not mean that the statute will always be constitutional as applied. There may be borderline conduct which would justify a finding of unfitness to teach but about which a teacher would not have a sufficiently definite warning as to the possibility of suspension or revocation. (See *Jordan* v. *De George, supra,* 341 U.S. 223, 231-232 [95 L.Ed. 886, 892-893, 71 S.Ct. 703].)

[37]An action taken in defiance of the express orders of school officials could not, of course, be defended on the ground that the disobedient party believed in good faith that his judgment surpassed that of his superiors. (See *Board of Education* v. *Swan, supra,* 41 Cal.2d 546, 555-556.) On the other hand, a teacher could not be disciplined for refusing to follow an express order subsequently held to be unconstitutional. (*Parrish* v. *Civil Service Com.* (1967) 66 Cal.2d 260, 263-265 [57 Cal.Rptr. 623, 425 P.2d 223]; *Finot* v. *Pasadena City Board of Education, supra,* 250 Cal.App.2d 189, 202.)

[38]In discussing whether a teacher could be dismissed for using offensive language in a confidential letter, the court in *Jarvella* v. *Willoughby-Eastlake City School Dist., supra,* stated: "The freedom of action of a public school teacher, like that of all contracting parties, is partly hedged by the terms of his contract. But there is no term

enforcing such a broad provision might be inclined to probe into the private life of each and every teacher, no matter how exemplary his classroom conduct. Such prying might all too readily lead school officials to search for "telltale signs" of immorality in violation of the teacher's constitutional rights. (*Griswold* v. *Connecticut* (1965) 381 U.S. 479, 485 [14 L.Ed.2d 510, 515, 85 S.Ct. 1678].)[39] The proper construction of section 13202, however, minimizes the danger of such sweeping inquiries.[40] By limiting the application of that section to conduct shown to indicate unfitness to teach, we substantially reduce the incentive to inquire into the private lives of otherwise sound and competent teachers.

Finally, petitioner urges that the board cannot revoke his life diplomas because his questioned conduct does not rationally relate to his duties as a teacher. ██ ██ No person can be denied government employment because of factors unconnected with the responsibilities of that employment. (*Pickering* v. *Board of Education* (1968) 391 U.S. 563, 572 [20 L.Ed.2d 811, 819, 88 S.Ct. 1731]; *Shelton* v. *Tucker* (1960) 364 U.S. 479, 487-490 [5 L.Ed.2d 231, 236-238, 81 S.Ct. 247]; *Konigsberg* v. *State Bar*,

---

which waives his right to privacy, his right to private communication, free from unwarranted intrusion. This is not to say there may be no intrusion. The limit of a private right is reached where public injury begins. The pivotal phrase in the statement of rights is 'unwarranted intrusion.' Transposing into the statement the facts of this case, the action of the school board in intruding these private letters between the teacher and his job was unwarranted because there was no public injury. Absent this, the letters were within the protection of the First, Fourth, Ninth and Fourteenth Amendments to the United States Constitution . . . ." (233 N.E.2d 143, 146.) In holding that a federal employee could not be dismissed merely because of a homosexual act, the United States Court of Appeals for the District of Columbia explained, "The Due Process Clause may also cut deeper into the Government's discretion where a dismissal involves an intrusion upon that ill-defined area of privacy which is increasingly if indistinctly recognized as a foundation of several specific constitutional protections. . . .[T]he notion that it could be an appropriate function of the federal bureaucracy to enforce the majority's conventional codes of conduct in the private lives of its employees is at war with elementary concepts of liberty, privacy and diversity." (*Norton* v. *Macy, supra,* 417 F.2d 1161, 1164.)

[39]See Challenge, pp. 20-23; M. Hoffman, The Gay World (1968) pp. 87-88; 1 Emerson, Haber & Dorsen, Political and Civil Rights in the United States (3d ed. 1967) pp. 1260-1261; Report of the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary (1967) 90th Cong., 1st Sess.; Creech, *The Privacy of Government Employees* (1966) 31 Law & Contemp. Prob. 413; Note, *supra,* 66 Colum.L.Rev. 719; New York Times (April 4, 1969) p. 30, cols. 6-8. But see Note, *supra,* 82 Harv.L.Rev. 1738, 1742.

[40]Concerning related problems, see Challenge, pp. 20-23 (entrapment); M. Hoffman, The Gay World, *supra,* 85-87 (entrapment); Blackstone's Commentaries (Cooley ed., 4th ed. 1899) (First Amendment); Note, *supra,* 14 U.C.L.A. L.Rev. 581, 600-601 (First Amendment); *An Empirical Study of Enforcement and Administration in Los Angeles County* (1966) 13 U.C.L.A. L.Rev. 644, 690-707 (entrapment); Note (1965) 74 Yale L.J. 942 (entrapment); Note (1961) 70 Yale L.J. 623, 631-635 (entrapment); New York Times (May 11, 1966) p. 36, col. 2 (entrapment); New York Times (April 2, 1966) p. 1, col. 1 (entrapment); New York Times (July 24, 1967), p. 19, col. 1 (entrapment).

*supra,* 353 U.S. 252, 262 [1 L.Ed.2d 810, 819, 77 S.Ct. 722]; *Schware* v. *Board of Bar Examiners, supra,* 353 U.S. 232, 238-239 [1 L.Ed.2d 796, 801-802, 77 S.Ct. 752, 64 A.L.R.2d 288]; *Wieman* v. *Updegraff* (1952) 344 U.S. 183, 192 [97 L.Ed. 216, 222, 73 S.Ct. 215]; *United Public Workers* v. *Mitchell* (1947) 330 U.S. 75, 101 [91 L.Ed. 754, 773, 67 S.Ct. 556]; *Scott* v. *Macy* (1965) 349 F.2d 182 [121 App.D.C. 205]; *Norton* v. *Macy, supra,* 417 F.2d 1161, 1164 & fn. 7; see 1 Emerson Haber & Dorsen, Political and Civil Rights in the United States, supra, pp. 363-364; Reich, *The New Property* (1964) 73 Yale L.J. 733, 782.)[41] Again, however, the proper construction of section 13202 avoids this problem, for that interpretation would bar disciplinary action against petitioner unless the record demonstrated that petitioner's conduct did indicate his unfitness to teach.

IV.  *The record contains no evidence that petitioner's conduct indicated his unfitness to teach.*

As we have stated above, the statutes, properly interpreted, provide that the State Board of Education can revoke a life diploma or other document of certification and thus prohibit local school officials from hiring a particular teacher only if that individual has in some manner indicated that he is unfit to teach. ■  Thus an individual can be removed from the teaching profession only upon a showing that his retention in the profession poses a significant danger of harm to either students, school employees, or others who might be affected by his actions as a teacher. Such a showing may be based on testimony (Gov. Code, § 11513), on official notice (Gov. Code, § 11515), or on both. Petitioner's conduct in this case is not disputed. Accordingly, we must inquire whether any adverse inferences can be drawn from that past conduct as to petitioner's teaching ability,[42] or as to the possibility that publicity surrounding past conduct may in and of itself substantially impair his function as a teacher.

---

[41] *Saunders* v. *City of Los Angeles* (1969) 273 Cal.App.2d 407, 412 [78 Cal. Rptr. 236], may suggest that no rational connection need be shown between the improper conduct and fitness for the profession involved. To the extent that *Saunders* conflicts with our opinion it is disapproved.

As to whether, as a philosophical proposition, the law ought to prohibit acts merely because they are "immoral," regardless of whether any secular interest of the society is harmed by that "immorality," *compare* H. L. A. Hart, Law, Liberty and Morality, *supra;* J. S. Mill, On Liberty (1859); *with* Devlin, The Enforcement of Morals (1959); J. F. Stephens, Liberty, Equality, Fraternity (1873).

[42] Compare *Schware* v. *Board of Bar Examiners, supra,* 353 U.S. 232, 251 [1 L.Ed.2d 796, 808, 77 S.Ct. 752, 64 A.L.R.2d 288] (Frankfurter, J., concurring); *Posusta* v. *United States, supra,* 285 F.2d 533, 536; *Norton* v. *Macy, supra,* 417 F.2d 1161, 1168.

As to this crucial issue, the record before the board and before this court contains no evidence whatsoever. The board called no medical, psychological, or psychiatric experts to testify as to whether a man who had had a single, isolated, and limited homosexual contact would be likely to repeat such conduct in the future. The board offered no evidence that a man of petitioner's background was any more likely than the average adult male to engage in any untoward conduct with a student. The board produced no testimony from school officials or others to indicate whether a man such as petitioner might publicly advocate improper conduct. The board did not attempt to invoke the provisions of the Government Code authorizing official notice of matters within the special competence of the board.[43]

This lack of evidence is particularly significant because the board failed to show that petitioner's conduct in any manner affected his performance as a teacher. There was not the slightest suggestion that petitioner had ever attempted, sought, or even considered any form of physical or otherwise improper relationship with any student.[44] There was no evidence that petitioner had failed to impress upon the minds of his pupils the principles of morality as required by section 13556.5 of the Education Code.[45] There is no reason to believe that the Schneringer incident affected petitioner's apparently satisfactory relationship with his co-workers.[46]

---

[43]Section 11515 of the Government Code provides: "In reaching a decision official notice may be taken, either before or after submission of the case for decision, of any generally accepted technical or scientific matter within the agency's special field, and of any fact which may be judicially noticed by the courts of this state. Parties present at the hearings shall be informed of the matters noticed and these matters shall be noted in the record, referred to therein, or appended thereto. Any such party shall be given a reasonable opportunity on request to refute the officially noticed matters by evidence or by written or oral presentation of authority, the manner of such refutation to be determined by the agency."

[44]This case is thus clearly distinguishable from *Bernstein* v. *Board of Medical Examiners* (1962) 204 Cal.App.2d 378 [22 Cal.Rptr. 419], which affirmed disciplinary action against a psychiatrist convicted of statutory rape against a 16-year-old girl whom he was supposed to be treating for sexual promiscuity. (Compare *Norton* v. *Macy, supra,* 417 F.2d 1161, 1166, regarding the existence of cause for dismissing a homosexual employee ("If an employee makes offensive overtures while on the job . . . the reactions of other employees . . . with whom he comes in contact in the performance of his official functions may be taken into account.").)

[45]Respondent does not explain what interpretation, if any, state or local education officials have given to this rather broad statute. It would appear, however, that the constitutional limitations on the permissible meaning of the statute limit its relevance to petitioner's private life. (See, e.g., *Everson* v. *Board of Education* (1947) 330 U.S. 1, 8 [91 L.Ed. 711, 719, 67 S.Ct. 504, 168 A.L.R. 1392]; *West Virginia* v. *Barnette, supra,* 319 U.S. 624; *Meyer* v. *Nebraska* (1923) 262 U.S. 390 [67 L.Ed. 1042, 43 S.Ct. 625, 29 A.L.R. 1446]; *Keyishian* v. *Board of Regents* (1967) 385 U.S. 589 [17 L.Ed.2d 629, 87 S.Ct. 675]; *Epperson* v. *Arkansas* (1968) 393 U.S. 97 [21 L.Ed. 2d 228, 89 S.Ct. 266]; *Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733].)

[46]See *Pickering* v. *Board of Education, supra,* 391 U.S. 563, 569-570 [20 L.Ed.2d 811, 817-818, 88 S.Ct. 1731].

The board revoked petitioner's license three years after the Schneringer incident; that incident has now receded six years into the past. Petitioner's motives at the time of the incident involved neither dishonesty nor viciousness, and the emotional pressures on both petitioner and Schneringer suggest the presence of extenuating circumstances. Finally, the record contains no evidence that the events of April 1963 have become so notorious as to impair petitioner's ability to command the respect and confidence of students and fellow teachers in schools within or without the Lowell Joint School District.

Before the board can conclude that a teacher's continued retention in the profession presents a significant danger of harm to students or fellow teachers, essential factual premises in its reasoning should be supported by evidence or official notice. In this case, despite the quantity and quality of information available about human sexual behaviour,[47] the record contains no such evidence as to the significance and implications of the Schneringer incident. Neither this court nor the superior court is authorized to rectify this failure by uninformed speculation or conjecture as to petitioner's future conduct. (See *H. D. Wallace & Associates* v. *Department of Alcoholic etc. Control* (1969) 271 Cal.App.2d 589, 593 [76 Cal.Rptr. 749]; *Bley* v. *Board of Dental Examiners* (1927) 87 Cal.App. 193, 196 [261 P. 1036].)

The facts in this case closely resemble those in *Norton* v. *Macy, supra,* 417 F.2d 1161. In *Norton* a federal employee was dismissed for homosexual behavior outside of working hours which the United States Civil Service Commission labeled "immoral." The court held that he could be dismissed only if he had committed or was likely to commit some act with an "ascertainable deleterious effect on the efficiency of the service." (P. 1165.) The employee's immediate superior testified that he was competent and performed very good work. Federal officials conceded that the "immoral" conduct caused no problems of national security and that the "immorality" had provoked no difficulties with fellow employees. The employee had neither openly flaunted nor carelessly displayed his unorthodox sexual conduct in public. The government justified the dismissal only by a vague

[47]For detailed bibliographies, see I. Bieber, Homosexuality, A Psychoanalytic Study (1962) pp. 351-353; M. Hoffman, The Gay World, *supra,* pp. 203-205; A. Cory, The Homosexual in America, *supra,* pp. 293-295. See also Report of the Subcommittee on Sex Crimes of the Assembly Interim Committee on Judicial System and Judicial Process, Journal of the Assembly (1952) Second Ex. Sess., p. 136 et seq.; Department of Mental Hygiene, Final Report on California Sexual Deviation Research (1954); New York Times (Dec. 11, 1968) p. 21, col. 1.

According to the United States Civil Service Commission's Director of Personnel Investigations, homosexual employees are in general as efficient as heterosexual employees. (Note, *supra,* 82 Harv.L.Rev. 1738, 1741.)

reference to the unsubstantiated possibility that the conduct might tend to embarrass the agency for which the employee had worked. The Court of Appeals for the District of Columbia declined to speculate on the record before it whether the employee might someday prove unfit for government service; the court ruled the dismissal arbitrary and thus invalid.

Respondent relies heavily on *Sarac* v. *Board of Education* (1967) 249 Cal.App.2d 58 [57 Cal.Rptr. 69]. The facts involved in *Sarac* are clearly distinguishable from the instant case; the teacher disciplined in that case had pleaded guilty to a criminal charge of disorderly conduct arising from his homosexual advances toward a police officer at a public beach; the teacher admitted a recent history of homosexual activities. The court's discussion in that case includes unnecessarily broad language suggesting that all homosexual conduct, even though not shown to relate to fitness to teach, warrants disciplinary action. (*Id.* at pp. 63-64.) The proper construction of section 13202, however, as we have demonstrated, is more restricted than indicated by this dicta in *Sarac*, and to the extent that *Sarac* conflicts with this opinion it must be disapproved.

Although the superior court in the instant case rendered a conclusion of law that petitioner had demonstrated his unfitness to teach, we cannot ascertain with certainty whether or not the court in so ruling relied upon this erroneous dicta in *Sarac*. (Compare *Screws* v. *United States* (1945) 325 U.S. 91, 106-107 [89 L.Ed. 1495, 1505-1506, 65 S.Ct. 1031].) █ In any event, "the ultimate conclusion to be drawn from undisputed facts is a question of law for an appellate court [citations]." (*Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, 74, fn. 7. █ Even if the trial court's statement were to be construed as a finding of fact it would not permit us to affirm the board's action, since, as indicated, no "credible, competent evidence" supports any such inference of petitioner's unfitness to teach. (*Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, 69; *Konigsberg* v. *State Bar, supra,* 353 U.S. 252, 262, 273 [1 L.Ed.2d 810, 819,825, 77 S.Ct. 722]; *Schware* v. *Board of Bar Examiners, supra,* 353 U.S. 232, 246-247 [1 L.Ed.2d 796, 805-806, 77 S.Ct. 752, 64 A.L.R.2d 288].)

V. *Conclusion*

In deciding this case we are not unmindful of the public interest in the elimination of unfit elementary and secondary school teachers. (See *Beilan* v. *Board of Education* (1958) 357 U.S. 399, 406-408 [2 L.Ed.2d 1414, 1420-1421, 78 S.Ct. 1317]; *Adler* v. *Board of Education* (1952) 342 U.S. 485, 493 [96 L.Ed. 517, 524, 72 S.Ct. 380, 27 A.L.R.2d 472]; *Board of Education* v. *Swan, supra,* 41 Cal.2d 546, 553-554; *Vogulkin* v. *State Board of Education* (1961) 194 Cal.App.2d 424, 429-430 [15 Cal. Rptr. 335].) But petitioner is entitled to a careful and reasoned inquiry into his

fitness to teach by the Board of Education before he is deprived of his right to pursue his profession. (See Report of the Senate Interim Committee on Licensing Business and Professions (1955) App.J. Senate, vol. 2, pp. 38-39, 63; Note, *supra,* 44 Cal.L.Rev. 403, 405; Note, *supra,* 15 Hastings L. J. 339, 346; Note (1962) 14 Stan.L.Rev. 533, 541.) ■ "The right to practice one's profession is sufficiently precious to surround it with a panoply of legal protection" (*Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, 75), and terms such as "immoral," "unprofessional," and "moral turpitude" constitute only lingual abstractions until applied to a specific occupation and given content by reference to fitness for the performance of that vocation.

The power of the state to regulate professions and conditions of government employment must not arbitrarily impair the right of the individual to live his private life, apart from his job, as he deems fit. Moreover, since modern hiring practices purport to rest on scientific judgments of fitness for the job involved, a government decision clothed in such terms can seriously inhibit the possibility of the dismissed employee thereafter successfully seeking non-government positions.[48] (See *Matthews* v. *Murphy* (1901) 23 Ky.LawRep. 750 [63 S.W. 785, 786]; Note (1966) 66 Colum.L.Rev. 719, 720; Note (1952) 52 Colum.L.Rev. 787, 798.) That danger becomes especially acute under circumstances such as the present case in which loss of certification will impose upon petitioner "a 'badge of infamy,' . . . fixing upon him the stigma of an official defamation of character." (*Norton* v. *Macy, supra,* 417 F.2d 1161, 1164, fns. 8 & 9.)

Our conclusion affords no guarantee that petitoner's life diplomas cannot be revoked. If the Board of Education believes that petitioner is unfit to teach, it can reopen its inquiry into the circumstances surrounding and the implications of the 1963 incident with Mr. Schneringer.[49] The board also has at its disposal ample means to discipline petitioner for future misconduct.[50]

---

[48]Not even the respondent board suggests that a homosexual ought to be excluded from all professions and types of employment. "Respondent does not take the rigid position of urging that homosexuals should be barred from participating in the social and economic life of California. Respondent recognizes that many talented and gifted homosexuals have contributed markedly to our culture in the fields of art, literature and the theater. . . ." (Respondent's brief, p. 14.) (*Boutilier* v. *Immigration Service, supra,* 387 U.S. 118, 129-130 [18 L.Ed.2d 661, 668-669] (Douglas, J., dissenting); A. Cory, The Homosexual in America, *supra,* p. 40; Time (Jan. 21, 1966) vol. 87, pp. 40-41.)

[49]Compare *Slochower* v. *Board of Education* (1956) 350 U.S. 551, 559 [100 L.Ed. 692, 700, 76 S.Ct. 637]; *Lorenz* v. *Board of Medical Examiners, supra,* 46 Cal.2d 684, 687; *In re Hallinan, supra,* 43 Cal.2d 243, 254; *Scott* v. *Macy, supra,* 349 F.2d 182, 185 (concurring opinion of Judge McGowan); *Neal* v. *Bryant* (Fla. 1962) 149 So.2d 529, 534, 97 A.L.R.2d 819.

[50]Compare *Schware* v. *Board of Bar Examiners, supra,* 353 U.S. 232, 247 [1 L.Ed. 2d 796, 806, 77 S.Ct. 752, 64 A.L.R.2d 288].

Finally, we do not, of course, hold that homosexuals must be permitted to teach in the public schools of California. As we have explained, the relevant statutes, as well as the applicable principles of constitutional law, require only that the board properly find, pursuant to the precepts set forth in this opinion, that an individual is not fit to teach. Whenever disciplinary action rests upon such grounds and has been confirmed by the judgment of a superior court following an independent review of the evidence,[51] this court will uphold the result.

The judgment of the superior court denying the writ of mandate is reversed, and the cause is remanded to the superior court for proceedings consistent with this opinion.

Traynor, C. J., Peters, J., and Mosk, J., concurred.

**SULLIVAN, J.**—I dissent.

We deal here with the right and duty of respondent State Board of Education (Board) to discipline public schoolteachers for immoral or unprofessional conduct. The precise question before us is this: Did the Board properly revoke petitioner's life diplomas upon determining that petitioner, while employed as a teacher, had committed homosexual acts and engaged in a homosexual relationship with a fellow teacher and that such acts constituted immoral and unprofessional conduct within the meaning of sections 13202 and 13209 of the Education Code?[1]

The record is clear and without dispute. Petitioner, while employed as a teacher in the Lowell Joint School District, engaged in homosexual acts with Fred Schneringer, also a public schoolteacher. The acts took place in petitioner's apartment on four separate occasions, over a period of one week, in April 1963; both parties consented. It would serve no useful purpose to describe or detail them except to note that they did not fall within the statutory offenses of sodomy or oral copulation. Nor is it necessary to set forth the somewhat longer history of the relationship between the two men or interpret the overtones of petitioner's testimony concerning it. Petitioner admitted the commission of the acts and acknowledged that they were homosexual acts; he makes the same admissions on this appeal. Nevertheless it should also be noted that although making these admissions before the hearing officer, petitioner specifically denied that what he had done was an immoral act or unprofessional conduct or "a situation of moral turpitude." He also testified that he had become a homosexual at the age of 13, that he

---

[51]*Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, 69; *Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301, 308 [196 P.2d 20].

[1]Hereafter, unless otherwise indicated, all section references are to the Education Code.

had received treatment in his "mid-twenties" before entering the teaching profession and that "there had been no homosexual contact either desired or actual, from my time of entering the teaching profession until the situation with Fred Schneringer."[2]

In August 1965 an accusation was filed against petitioner with respondent Board alleging the foregoing incidents or at least one of them[3] as cause for the revocation of petitoner's life diplomas under sections 13202 and 13129 of the Education Code. (See Gov. Code, §§ 11501, 11503.) After a hearing at which petitioner appeared without counsel and testified, the hearing officer found that petitioner had committed acts involving immoral conduct in that (a) he engaged "in unnatural sex acts and practices of a homosexual nature" with Schneringer and (b) engaged "in a homosexual relationship" with the latter; that petitioner committed acts involving moral turpitude; that petitioner's showing did not establish extenuation or mitigation; that the homosexual relationship developed during a period of time when petitioner was counseling Schneringer with respect to the latter's marital problems; and that petitioner "does not regard his conduct as being censorable, and created the impression from his testimony that he was more concerned about Schneringer's having terminated the homosexual relation with [petitioner] under circumstances that indicated to respondent that Schneringer preferred female companionship."

The hearing officer concluded (under "Determination of Issues") that petitioner violated sections 13202 and 13129 of the Education Code in that he (1) "Committed acts involving moral turpitude; (2) Committed acts involving unprofessional conduct." Revocation of petitioner's life diplomas was recommended. On March 11, 1966, the Board adopted the decision of the hearing officer.

On February 14, 1967, petitioner sought in the superior court a writ of mandate commanding the Board to set aside its decision. In those proceedings, petitioner was represented by the same counsel who appears for him on this appeal. Upon the issuance of an alternative writ, the matter was submitted upon the administrative record which was received in evidence. The trial court, the Honorable Ralph Nutter, Judge, exercising its independent judgment on the evidence (Code Civ. Proc., § 1094.5, subd. (c); see *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 913-916 [80 Cal.Rptr. 89, 458 P.2d 33]) found, so far as is here material, as

---

[2]At the time of the administrative hearing in December 1965 petitioner was 39 years old which would indicate he was about 37 years old at the time of the acts involved. He resigned from the Lowell Joint School District in May 1964.

[3]The accusation and other administrative pleadings are not in the instant record.

follows: That the weight of the evidence adduced at the administrative hearing supported the findings of fact and the findings of fact supported the determination of issues; that the decision was fully supported by the findings of fact and the determination of issues; that, upon consideration of the evidence adduced at the administrative hearing, petitioner committed the homosexual acts involved and that "[t]hese acts involved moral turpitude and constituted unprofessional conduct. . . ."

The trial court concluded that petitioner committed homosexual acts involving moral turpitude and that such acts constituted immoral and unprofessional conduct within the meaning of sections 13202 and 13209 of the Education Code; and that the action of the Board in revoking the life diplomas was correct "in that petitioner *demonstrated he was unfit for service as a teacher* in the California public school system within the meaning" (italics added) of the above sections. The court entered judgment discharging the alternative writ and denying the petition for the peremptory writ.

On appeal the Court of Appeal, Second Appellate District, Division Two, affirmed the denial of mandate in an opinion prepared by Presiding Justice Roth and concurred in by Justice Herndon and Justice Fleming, in which they declared that "we cannot say there is no rational connection between petitioner's homosexual conduct and his fitness for service in the public school system." I am firmly convinced that the superior court and the Court of Appeal correctly disposed of the matter. I must disagree with the analysis proffered by the majority opinion of this court. I would affirm the judgment.

Section 13202 of the Education Code which is at the center of this controversy provides in pertinent part: "The State Board of Education shall revoke or suspend for immoral or unprofessional conduct, . . . or for any cause which would have warranted the denial of an application for a certification document or the renewal thereof, or for evident unfitness for service, life diplomas, documents, or credentials issued pursuant to this code." Section 13129 of the same code provides that the Board ". . . may deny any application for the issuance of a credential or a life diploma . . . made by an applicant who . . . (e) Has committed any act involving moral turpitude. . . ." Although the first section is couched in mandatory terms and the second in permissive terms (§ 36),[4] I do not think this is an issue since the Board did in fact impose discipline under section 13202.

The crucial question before us is whether the homosexual acts and relationship in which petitioner engaged constituted immoral or unprofessional conduct within the meaning of section 13202.

---

[4]Section 36 provides: " 'Shall' is mandatory and 'may' is permissive."

We have said that "The term 'immoral' has been defined generally as that which is hostile to the welfare of the general public and contrary to good morals. Immorality has not been confined to sexual matters, but includes conduct inconsistent with rectitude, or indicative of corruption, indecency, depravity, dissoluteness; or as wilful, flagrant, or shameless conduct showing moral indifference to the opinions of respectable members of the community, and as an inconsiderate attitude toward good order and the public welfare." (*Orloff* v. *Los Angeles Turf Club* (1951) 36 Cal.2d 734, 740 [227 P.2d 449].)

In *Sarac* v. *State Board of Education* (1967) 249 Cal.App.2d 58 [57 Cal.Rptr. 69], the court upheld the Board's revocation of a general secondary teaching credential pursuant to section 13202 upon the rationale that homosexual acts constituted immoral and unprofessional conduct within the compass of that section. In that case the acts were committed on a public beach and the teacher was arrested for violation of Penal Code section 647, subdivision (a), and convicted, on his plea of guilty, of violation of a municipal ordinance. However, the accusation filed before the Board charged that he was unfit for service in the public school system under section 13202 because of his conduct as well as because of the criminal proceedings occasioned by his conduct. There, as in the instant case, the trial court on review of the administrative proceedings concluded that the teacher had committed a homosexual act involving moral turpitude which conduct constituted both immoral and unprofessional conduct within the meaning of section 13202. There, as in the instant case, the trial court concluded that the teacher had *demonstrated that he was unfit for service in the public school system*. There, as in the instant case, on appeal from the trial court's denial of a writ of mandate, the teacher challenged the Board's action on the ground among others that it had failed to establish any rational connection between his homosexual conduct and ". . . immorality and unprofessional conduct as a teacher on his part and his fitness for service in the public schools; . . ." (249 Cal.App.2d at p. 62.)

The court's rejection of the appeal in that case is a convincing answer to the question now confronting us: ". . . Homosexual behavior has long been contrary and abhorrent to the social mores and moral standards of the people of California as it has been since antiquity to those of many other peoples. It is clearly, therefore, immoral conduct within the meaning of Education Code, section 13202. It may also constitute unprofessional conduct within the meaning of that same statute as such conduct is not limited to classroom misconduct or misconduct with children. (See *Beilan* v. *Board of Public Education*, 357 U.S. 399, 406-408 [2 L.Ed.2d 1414, 78 S.Ct. 1317].) It certainly constitutes evident unfitness for service in the public school system within the meaning of that statute. (Cf. Ed. Code,

§§ 13206-13208.) In view of appellant's statutory duty as a teacher to 'endeavor to impress upon the minds of the pupils the principles of morality' (Ed. Code, § 7851) and his necessarily close association with children in the discharge of his professional duties as a teacher, there is to our minds an obvious rational connection between his homosexual conduct on the beach and the consequent action of respondent in revoking his secondary teaching credential on the statutory grounds of immoral and unprofessional conduct and evident unfitness for service in the public school system of this state." (249 Cal.App.2d at pp. 63-64.)

The majority argue that *Sarac* is distinguishable from the instant case on its facts. It is asserted that the teacher's homosexual conduct occurred on a public beach, whereas this petitioner's conduct occurred in the privacy of his apartment. Apparently this asserted difference reflects the view that, absent a criminal offense, petitioner's private life is his own business and the state ". . . must not arbitrarily impair the right of the individual to live his private life, apart from his job, as he deems fit. . . ." But the clandestine character of petitioner's acts did not render them any the less homosexual acts. These still remained, to borrow the language of *Sarac* ". . . contrary and abhorrent to the social mores and moral standards of the people of California. . . ." (*Sarac* v. *State Board of Education, supra,* 249 Cal.App. 2d 58, 63.) It would be fatuous to assume that such acts became reprehensible only if committed in public. One would not expect petitioner and Schneringer to commit the acts here involved (which, as I have said, need not be detailed) in full view of the citizenry.

It is also asserted by the majority that the teacher in *Sarac* pleaded guilty to and was convicted of a criminal charge. However, as I have pointed out, the accusation filed with the Board in that case was based primarily on the teacher's homosexual conduct.[5] Indeed, it is manifest from the opinion in *Sarac,* that it was the teacher's homosexual conduct, apart from his subsequent arrest, which fell within the compass of section 13202 and warranted revocation of his credentials. (*Sarac* v. *State Board of Education, supra,* 249 Cal.App.2d 58, 62-63.) Nowhere in the statute is there a requirement that the conduct must constitute a crime before the diploma or credential can be suspended or revoked. In fact other sections of the

---

[5]According to the opinion in *Sarac* the accusation filed with the Board ". . . charged him in substance with having engaged in immoral and unprofessional conduct within the meaning of Education Code, section 13202, in having . . . at a public beach. . . ."committed homosexual acts, describing them. It then recited the teacher's conviction and charged that he was unfit for service as a teacher ". . . because of this conduct by him on the beach, because of the just-mentioned criminal proceedings against him occasioned by such conduct, and because of two admissions he had made to said Bowers on or about the said July 28, 1962, that he had had a homosexual problem since he was 20 years old and that the last time he had had sexual relations with a man was approximately three weeks earlier." (249 Cal.App.2d at pp. 60-61.)

Education Code provide for the revocation of any credential for conviction of specified crimes (§ 13206)[6] or sex offenses (§ 13207).[7] Therefore, not only from an examination of the language of the sections but also from a consideration of the sections in the light of the full statutory pattern, it is clear that sections 13202 and 13129 apply to a teacher's immoral and

[6]Section 13206 provides: *"Upon the becoming final of the conviction* of the holder of any credential, including a life diploma, or document, issued by the State Board of Education of a violation, or attempted violation, of any one or more of Penal Code Sections 187 to 191, 192 insofar as said section relates to voluntary manslaughter, 193, 194-232, both inclusive, 244, 245, 261 to 267, both inclusive, 273a, 273f, 273g, 278, 285 to 288a, both inclusive, 424, 425, 484 to 488, both inclusive, insofar as said sections relate to felony convictions, 503 and 504, or of Penal Code Section 272, the State Board of Education *shall forthwith revoke* the credential, life diploma, or document." (Italics added.)

[7]Section 13207 provides in pertinent part: "Whenever the holder of any credential, life diploma, or document issued by the State Board of Education has been *convicted of any sex offense* as defined in Section 12912 . . . the State Board of Education *shall forthwith suspend* the credential, life diploma, or document. If the conviction is reversed and the holder is acquitted of the offense in a new trial or the charges against him are dismissed, the board shall forthwith terminate the suspension of the credential, life diploma, or document. *When the conviction becomes final* or when imposition of sentence is suspended the board *shall forthwith revoke* the credential, life diploma, or document." (Italics added.)

Section 12912 provides: " 'Sex offenses' as used in [section] 13207 . . . means any one or more of the offenses listed below:

(a) Any offense defined in Sections 266, 267, 285, 286, 288, 288a, 647a, subdivision 3 or 4 of Section 261, or subdivisions (a) or (d) of Section 647 of the Penal Code.

(b) Any offense defined in former subdivision 5 of former Section 647 of the Penal Code repealed by Chapter 560 of the Statutes of 1961, or any offense defined in former subdivision 2 of former Section 311 of the Penal Code repealed by Chapter 2147 of the Statutes of 1961 if the offense defined in such sections was committed prior to September 15, 1961, to the same extent that such an offense committed prior to such date was a sex offense for the purposes of this section prior to September 15, 1961.

(c) Any offense defined in Section 314 of the Penal Code committed on or after September 15, 1961.

(d) Any offense defined in former subdivision 1 of former Section 311 of the Penal Code repealed by Chapter 2147 of the Statutes of 1961 committed on or after September 7, 1955, and prior to September 15, 1961.

(e) Any offense involving lewd and lascivious conduct under Section 272 of the Penal Code committed on or after September 15, 1961.

(f) Any offense involving lewd and lascivious conduct under former Section 702 of the Welfare and Institutions Code repealed by Chapter 1616 of the Statutes of 1961 if such offense was committed prior to September 15, 1961, to the same extent that such an offense committed prior to such date was a sex offense for the purposes of this section prior to September 15, 1961.

(g) Any attempt to commit any of the above-mentioned offenses.

(h) Any offense committed or attempted in any other state which, if committed or attempted in this State, would have been punishable as one or more of the above-mentioned offenses."

unprofessional conduct and to his acts of moral turpitude, even though such conduct does not constitute a crime.

The court in *Sarac* also sustained the trial court's finding that the homosexual act there committed was one involving moral turpitude. As already stated, a similar finding and determination were made in the instant matter not only in the administrative proceedings but also in the superior court proceedings on review. The determination is unassailable. Although we have recognized on occasion that the problem of defining moral turpitude is not without difficulty (*In re Hallinan* (1954) 43 Cal.2d 243, 247 [272 P.2d 768]; *In re Hatch* (1937) 10 Cal.2d 147, 150-151 [73 P.2d 885]), nevertheless this court has for many years followed the lodestar of *Matter of Coffey* (1899) 123 Cal. 522, 524 [56 P. 448], which relying on *Bouvier,* defined moral turpitude as ". . . everything done contrary to justice, honesty, modesty or good morals. . . ." (See for example: *Marlowe* v. *State Bar* (1965) 63 Cal.2d 304, 308 [46 Cal.Rptr. 326, 405 P.2d 150]; *Arden* v. *State Bar* (1959) 52 Cal.2d 310, 321 [341 P.2d 6]; *Call* v. *State Bar* (1955) 45 Cal.2d 104, 109 [287 P.2d 761]; *In re McAllister.* (1939) 14 Cal.2d 602, 603 [95 P.2d 932]; *In re Hatch, supra,* 10 Cal.2d 147, 150-151 [73 P.2d 885]; *Jacobs* v. *State Bar* (1933) 219 Cal. 59, 64 [25 P.2d 401]; *Lantz* v. *State Bar* (1931) 212 Cal. 213, 218 [298 P. 497].)

In *In re Boyd* (1957) 48 Cal.2d 69 [307 P.2d 625] this court ordered the suspension from the practice of law of an attorney convicted on his plea of guilty of a violation of former Penal Code section 647, subdivision 5, providing that " . . . [e]very lewd or dissolute person is a vagrant. . . ." The court held that the acts constituting the offense in question involved moral turpitude, declaring: "Moral turpitude has been defined as: 'An act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man.' [Citations.] [Par.] No citation of authority or argument is needed to support the conclusion that the conduct of petitioner fell within the purview of the above definition. His offense was one of depravity, contrary to the accepted and customary rule of right and duty between man and man, and was therefore an offense involving moral turpitude. The act was committed in a public place. Without further recitation of the facts, it is enough to say that such conduct is unworthy of a member of the legal profession." (48 Cal.2d at p. 70.)

If the foregoing applies to an attorney whose professional contacts presumably are almost invariably with adults, how much more significant is the rationale when applied to a school teacher whose professional duties are directed exclusively towards the *moral* as well as the intellectual, social and civic development of young and impressionable minds. Section 13556.5

enjoins all teachers to ". . . endeavor to impress upon the minds of the pupils the principles of *morality*, truth, justice, patriotism. . . ."[8] Quite apart from this statutory mandate, petitioner stood *in loco parentis;* his young charges looked to him as the person taking the place of their parents during school hours. They looked to him not only for explicit words of guidance but as an example of good conduct. Nevertheless, as the board and the trail court determined, he not only was a potential danger to them because of his immoral acts but especially so because of his insistence that such acts which he frankly admitted, were not in his view immoral at all.

In view of the foregoing, as I have already said, I am in agreement with the trial court and the Court of Appeal, and like them, I cannot say on this record that there is no rational connection between petitioner's homosexual acts and his fitness for service in the public school system.

A considerable part of the majority opinion is devoted to a consideration of the terms "immoral conduct," "unprofessional conduct," and "moral turpitude" in a wide variety of contexts other than that of the teaching profession and in reference to numerous occupations having no relevance to the instant problem, which need not be enumerated and require no attention other than to say they cover a range from barbers to veterinarians. After a survey of this catalogue, the majority posit the following views, among others: That in using the above-quoted terms, "the Legislature surely did not mean to endow the employing agency with the power to dismiss any employee whose personal, private conduct incurred its disapproval"; that unless a reasonable and restrictive interpretation of the term is adopted, the statutes before us would possibly "subject to discipline virtually every teacher in the state"; that the Legislature for example did not intend to compel disciplinary action against teachers for "peccadillos" or "passing conduct" if it "did not affect students or fellow teachers"; that "incidents of extramarital heterosexual conduct against a background of years of satisfactory teaching would not constitute 'immoral conduct' sufficient to justify revocation of a life diploma without any showing of an adverse effect on fitness to teach"; that by enacting section 13202 the Legislature did not intend "to establish a standard for the conduct of teachers that might vary widely with time, location, and the popular mood"; that the meaning of the above terms "must depend upon, and thus relate to, the occupation involved. . . ."; and that the Board "cannot abstractly characterize the conduct in this case as 'immoral,' 'unprofessional,' or 'involving moral turpitude.' "

Finally from this extensive disquisition the majority arrive at the conclu-

---

[8]The same language appeared in former section 7851 upon which section 13556.5 is based, as said former section read at the time of the commission of petitioner's acts.

sion that "Petitioner's actions cannot constitute immoral or unprofessional conduct or conduct involving moral turpitude within the meaning of section 13202 unless those actions indicate his unfitness to teach." But, assuming arguendo that this thesis has some validity, while reserving full acceptance of the opinion's ethical relativism, the plain, hard fact of the matter is that petitioner's conduct *did* indicate his unfitness to teach—indeed as the learned trial judge determined—*demonstrated* that petitioner *was* unfit for service as a teacher in the public schools.

Faced with this decision made by the Board with its expertise in educational matters upon a record vividly disclosing the homosexual acts involved, the majority nevertheless maintain that the record "contains no evidence whatsoever" indicating petitioner's unfitness to teach. Initially they assert that the Board called no medical, psychological, or psychiatric experts for an opinion as to the likelihood of petitioner's repeating the acts. Nowhere do I find in the Education Code, nor does the majority point out, that such evidence is indispensable to proceedings under the statute. The majority further argue that the Board offered no evidence that petitioner would be more likely to act improperly towards a student "than the average adult male"[9] and no evidence as to whether "petitioner might publicly advocate improper conduct." The majority opinion also asserts that no evidence was produced that petitioner failed to impress on the minds of his pupils the principles of morality as required by former section 7851. I am afraid that in all of this my colleagues of the majority lose sight of the fact that we are reviewing the record as brought before us, not the record which might have been more to their liking.

Petitioner made no attempt to introduce any of the evidence which the majority now deem so crucial and even indispensable and the Board found that the showing he did make did not establish extenuation or mitigation. While I realize that he chose to appear before the Board without counsel, nevertheless he did have counsel at all times during the proceedings in the trial court. Nevertheless at no time in the trial court did he offer to produce any additional evidence (see Code Civ. Proc., § 1094.5, subd. (d); see also *Merrill* v. *Department of Motor Vehicles, supra,* 71 Cal.2d 907, 914, fn. 10 and accompanying text), much less any evidence which the majority deem so essential, contenting himself with submitting the matter on the administrative transcript.

---

[9]On this point, we find an interesting sidelight in that portion of petitioner's testimony dealing with the gradual weakening and eventual termination of his friendship with Schneringer. "At any rate, during that trip, which was after our homosexual relationship, Mr. Schneringer with his younger son, were having qualms that I would take advantage of the child, and indeed I did not . . . ."

Finally, I point out that, if the record of the procedures before the Board and the superior court were as defective as the majority would make it out to be in that it lacks "essential factual premises" and contains "erroneous findings and conclusions," petitioner's counsel made no effort to bring such defects or errors to the attention of the trial court by appropriate objections or requests for specific findings (Code Civ. Proc., § 634) or to move for a new trial, (Code Civ. Proc., § 657) or to move to vacate the judgment and enter a different judgment (Code Civ. Proc., § 663). A short answer to all this is that, as two reviewing courts have already determined, the record is not inadequate, is free of error, and is fully supportive of the Board's action.

In sum, the majority opinion boils down to this: ". . . the Board failed to show that petitioner's conduct in any manner affected his performance as a teacher" and "petitioner is entitled to a careful and reasoned inquiry into his fitness to teach by the Board of Education before he is deprived of his right to pursue his profession." Taking this position, the majority remand this case to the superior court presumably, although they do not say so, to be remanded by that court in turn to the Board.

I feel it my duty to observe, with all due respect to the majority, that this action is taken without proper recognition of our function of review in cases of administrative boards as recently spelled out by this court unanimously in the *Merrill* case. (See *Merrill* v. *Department of Motor Vehicles, supra,* 71 Cal.2d 907.) To recapitulate: The Board in this case found on overwhelming evidence, indeed on the frank but unrepentent admissions of petitioner, that he had committed homosexual acts with another teacher and concluded that these acts constituted immoral and unprofessional conduct and acts involving moral turpitude. The trial court reached the same conclusion. The majority opinion is silent on this point. Yet I would respectfully suggest that it is an essential step in any process of reasoning which seeks to strike down the Board's action. Were petitioner's acts immoral or not? Or was he perhaps correct after all in maintaining they were not? The majority do not answer this question; nevertheless they reverse the judgment and remand the cause to the trial court for further proceedings. I would think that under the circumstances the question should be answered for the guidance of the court below on retrial; that court, as well as the Board, should be told whether or not they were in error in concluding that petitioner's homosexual acts were immoral and involved moral turpitude. As I said at the beginning, this is the pivotal question and I think it was correctly answered by the Board, the trial judge and the three appellate justices.

This brings me to the next step in the record. The Board, possessing

expertise in passing upon the fitness of teachers for the public school system and having the petitioner before it, hearing his testimony, and reviewing his immoral and unprofessional conduct, determined that he was unfit and revoked his diplomas. The trial court, reviewing this administrative record which petitioner chose not to augment, arrived at the same findings and conclusions, and found or concluded (it makes little difference how we categorize it) that petitioner had demonstrated his unfitness and that the decision of the Board was correct.

Finally, I am unable to understand how the majority can reject the pertinent precedent and compelling rationale of the *Sarac* case (*Sarac* v. *State Board of Education, supra,* 249 Cal.App.2d 58) as being distinguishable, which it is not, and embrace the out-of-state decision of *Norton* v. *Macy* (D.C. Cir. 1969) 417 F.2d 1161 as one closely resembling the instant case, which it definitely does not. *Norton* involved a federal employee charged with off-duty homosexual conduct. He was not a school teacher, much less one who had committed the acts with a fellow teacher; he was not, like this petitioner, a person charged with the responsibility of impressing the principles of morality on young minds; so far as appears, he had no dealings with children at all, nor, so far as appears, was he a person like petitioner, who while frankly admitting homosexual acts, insisted nevertheless that he had done nothing immoral. In *Norton* the court stated that "the employer agency must demonstrate some 'rational basis' for its conclusion that a discharge 'will promote the efficiency of the service.' 'The ultimate criterion [is] whether the employer acted reasonably. . . .' " It found the dismissal arbitrary because the employer had shown no such basis.

In the instant case, both the Board and the trial court concluded that petitioner was unfit. I cannot say there is no rational connection between petitioner's homosexual acts and his fitness to teach. As the trial court properly determined, the Board's findings were supported by the weight of the evidence and its determination of the issues was supported by its findings. The Board, therefore, did not abuse its discretion. (Code Civ. Proc., § 1094.5, subd. (c).) We have no right to upset its action. I would affirm the judgment of the trial court.

McComb, J., concurred.

**BURKE, J.**—I concur generally with the dissenting opinion of Justice Sullivan, but I am impelled to express an additional view.

The majority opinion of this court contains an elaborate discussion of varying factual situations in which homosexual acts could occur, states that

the record contains no finding of petitioner's unfitness to teach and remands the case to the trial court for further proceedings consistent with its opinion as though the further trial of an action at law were contemplated. Yet no factual or evidentiary issues are presented to a reviewing court by this case; it is agreed that the facts found by the State Board of Education are supported by the evidence produced before it. The majority's reversal of the board's action, therefore, must be viewed as a ruling on a question of law, that is, a holding that on the facts found here it is error to conclude that immoral or unprofessional acts were committed or that the acts that were committed involved moral turpitude. I do not agree with that conclusion for it is evident to me that the State Board of Education properly exercised the statutory discretion vested in it in this case and that its decision should be sustained on judicial review in any court of law.

Beyond that issue, however, lie the continuing difficulties inherent in a system of judicial review that requires courts to reweigh the evidentiary matters that are presented to it in the cold record of an administrative proceeding. This case, and other recent cases,[1] have involved the courts in the untenable position of attempting to assess factual issues of conduct, motive and intent that could better be left to the governmental agencies upon whom the discretion has been conferred by the Legislature. I acknowledge, of course, the statutory requirement for reweighing evidence under which trial courts must now conduct the judicial review of some administrative actions (Code Civ. Proc., § 1094.5), but that category of proceedings was created and is defined by this court's opinions in the field of constitutional law.[2] After long and earnest consideration of the matter I must express my own conviction that neither the Constitution of the United States nor the Constitution of the State of California compels any such result.

In California, unlike most other jurisdictions, trial courts are presently required to exercise their own independent judgment, based upon the weight of the evidence, in reviewing those decisions of statewide, legislatively created administrative agencies that are alleged to deprive one of his "vested rights." However, our trial courts are permitted to employ the ordinary substantial evidence review of all other administrative decisions, including

---

[1] Compare *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67 [64 Cal. Rptr. 785, 435 P.2d 553].

[2] See Tenth Biennial Report, Judicial Council of California (1945) pp. 139-143. This court should re-examine and ultimately reject the reasoning of the cases which established as a constitutional doctrine the requirement of a weight of evidence review of certain decisions of statewide, legislatively created administrative agencies. For example, *Laisne* v. *California State Board of Optometry,* 19 Cal.2d 831 [123 P.2d 457]; *Drummey* v. *State Board of Funeral Directors,* 13 Cal.2d 75 [87 P.2d 848]; *Standard Oil Co.* v. *State Board of Equalization,* 6 Cal.2d 557 [59 P.2d 119].

the rulings of "local agencies"[3] and statewide agencies constitutionally empowered to exercise "judicial functions,"[4] even if their rulings affect "vested rights."

Apart from the artificiality of any distinction which makes the applicable scope of review dependent upon the type of agency involved and the type of rights affected, each of the above-quoted phrases has raised its own peculiar interpretive problems, thereby requiring an undesirable "case-by-case" approach to deciding what kind of judicial review is appropriate.[5] A return[6] to uniform use of substantial evidence review of administrative decisions would eliminate these unworkable distinctions, and would assure that administrative expertise and discretion in factfinding are given the weight and consideration accorded by courts in other jurisdictions.[7] Our courts could then perform the function courts perform elsewhere, that of ruling on issues of law, including the question of whether administrative orders are supported by substantial evidence, except in cases where the Legislature provides for a judicial reweighing of the evidence.

McComb, J., concurred.

---

[3]E.g., *Walker* v. *City of San Gabriel,* 20 Cal.2d 879 [129 P.2d. 349, 142 A.L.R. 1383].

[4]E.g., *Covert* v. *State Board of Equalization,* 29 Cal.2d 125 [173 P.2d 545].

[5]See California Administrative Mandamus (Cont. Ed. Bar 1966) §§ 5.50-5.75, pp. 63-91; 3 Witkin, Cal. Procedure (1954) Extraordinary Writs, p. 2484 et seq.; Kleps, *Certiorarified Mandamus Reviewed: The Courts and California Administrative Decisions—1949-1959* (1960) 12 Stan.L.Rev. 554, at 560-568; 2 Cal.Jur.2d, Administrative Law, p. 86 et seq.

[6]Prior to *Standard Oil Co.* v. *State Board of Equalization, supra,* 6 Cal.2d 557, all administrative decisions were reviewable on certiorari by a substantial evidence test. (McGovney, *The California Chaos in Court Review of the Decisions of State Administrative Agencies* (1942) 15 So.Cal.L.Rev. 391.)

[7]See 4 Davis, Administrative Law Treatise, ch. 29, § 29.01, pp. 114-118; Netterville, *Judicial Review: The "Independent Judgment" Anomaly* (1956) 44 Cal.L.Rev. 262.