Filed 11/26/13  Little Lake City School Dist. v. Commission on Professional Competence CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LITTLE LAKE CITY SCHOOL DISTRICT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>COMMISSION ON PROFESSIONAL COMPETENCE,<br><br>    Defendant and Respondent;<br><br>EILEEN HAWKINS,<br><br>    Real Party in Interest and Respondent. | B244991<br><br>(Los Angeles County<br>Super. Ct. No. BS135319) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Law Offices of Eric Bathen, Eric J. Bathen and Jordan C. Meyer for Plaintiff and Appellant.

No appearance for Respondent.

Rothner, Segall & Greenstone, Glenn Rothner and Constance Hsiao for Real Party in Interest and Respondent.

_____

Little Lake City School District (District) appeals the denial of its petition for a writ of mandate to set aside a decision by the Commission on Professional Competence (Commission) rejecting the District's attempted dismissal of Eileen Hawkins, a special education teacher. The District contends the evidence does not support the trial court's determination that there was no cause for dismissal. We conclude, however, that substantial evidence supports the court's determination and therefore will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

1.  *Factual Background*

    a.  *2007-2008 School Year*

Hawkins was employed by the District as a special education teacher for 13 years. She previously was employed as a general education teacher for 11 years. Her work as a special education teacher involved teaching children with learning difficulties in the Individualized Education Program (IEP) who spent most of their time in a general education classroom.

Hawkins worked at Studebaker Elementary School (Studebaker) in the 2007-2008 school year. She received a performance evaluation for that year in May 2008 from Dr. Susan Grant, principal of Studebaker Elementary School. The performance evaluation stated that Hawkins had met her job requirements and performance objectives "with reservation," with the exception of the area of "professionalism," for which she received a rating of "not met." It stated that Hawkins was not collaborating with classroom teachers on a regular basis and had failed to

2

timely inform the classroom teachers of the students' IEP goals. It stated regarding "attendance" that Hawkins was rarely absent, but "she is often late in arriving in the morning, and is frequently late to morning and afternoon staff meetings."

Hawkins prepared a rebuttal to the performance evaluation challenging some of its statements and conclusions. She stated that her schedule was arranged by the principal and did not allow sufficient time for her to meet with teachers.

b. *2008-2009 School Year*

Hawkins began to split her time between Studebaker and Lakeland Elementary School (Lakeland) in the 2008-2009 school year, spending mornings at Studebaker and afternoons at Lakeland. She received a performance evaluation for that year in the areas of "professionalism" and "attendance" only, in May 2009. It was prepared jointly by Dr. Grant and Yolanda McIntosh, principal of Lakeland.

The 2008-2009 performance evaluation stated that Hawkins had met her job requirements and performance objectives in those two areas "with reservation." It stated, with respect to "professionalism" that she had engaged in more direct communication with the administrator at Studebaker regarding setting IEP dates, but her direct communication with teachers concerning students' progress was "less than satisfactory" and McIntosh's "request to Mrs. Hawkins regarding her non-presence at Lakeland on Wednesday afternoons has not been honored." It stated regarding "attendance" that Hawkins was rarely absent, but she was frequently late in the morning, and she worked late in the evening, but "she needs to be accessible to teachers before school."

3

c.     *2009-2010 School Year*

Hawkins was assigned more than 20 students at Studebaker in the 2009-2010 school year and only 3 at Lakeland, yet she was required to divide her time equally between the two schools. She received a performance evaluation for that year in May 2010 only from McIntosh, principal of Lakeland. It stated that she had met her job requirements and performance objectives in the areas of "attendance" and "professionalism," met them "with reservation" in the areas of "subject matter knowledge," "classroom environment," and "student control," and that her performance was "unsatisfactory" in the area of "teaching strategies."

The 2009-2010 performance evaluation stated that Hawkins was not using the required Cell/ExLL instructional strategies. It also stated: "The materials used (Read Naturally) were not aligned with children[s]' instructional level, provide for direct instruction, or assess the children for the purpose of driving the instruction. In addition, children were not taught/offered strategies such as chunking, tracking, and going back and rereading. The only prompt/strategy offered was, 'Sound it out.' In fact, this same prompt was used with sight words. [¶] And finally she taught three different groups at once, two distinct readers, and a child working on math. Having to move from one subject area to another as witnessed, does not benefit children. It is imperative that she use strategies such as those mentioned above and those attached." The evaluation also included a list of specific recommendations on the application of teaching strategies.

The 2009-2010 performance evaluation also stated that because Hawkins was rated "unsatisfactory" in "teaching strategies," she was "required to receive assistance

4

from a Consulting Teacher as specified in the 'Permanent Teacher Intervention Component' in the Peer Assistance and Review program."

Dr. Joseph Ybarra, Jr., assistant superintendent of the District, met with Hawkins in May and June 2010. He provided her a written summary of the conference noting his concerns with her preparation of IEP's and the lack of services provided to some of her students. He directed Hawkins to (1) contact an administrator for training in CELL/ExLL; (2) attend a time management class in the fall of 2010; (3) "complete all IEP goals and objective[s] within one month of the initial IEP date"; (4) "input all components of the IEP process into the SEIS program within three days of all meetings"; and (5) report to the principals of Studebaker and Lakeland for an action plan. The summary stated that her failure to demonstrate significant improvement might lead to the termination of her employment. Hawkins submitted a rebuttal to the summary.

d. *2010-2011 School Year*

Tony Valencia, as the new principal of Studebaker, and McIntosh jointly presented a 90-Day Performance Improvement Plan to Hawkins in September 2010 identifying six areas needing improvement and listing several required actions for each area. The areas of improvement needed were (1) use of CELL/ExLL instructional strategies; (2) meeting the students' academic needs; (3) meeting all federal special education mandates; (4) timely informing the teaching staff of pertinent information; (5) timely and professionally completing all IEP's; and (6) completing a time management class during the school year. The plan stated that the principals would

5

meet with Hawkins five times in the following 90 days to discuss her progress. It stated that her failure to demonstrate significant improvement might lead to the termination of her employment.

Valencia and McIntosh met with Hawkins on several occasions and issued conference summaries, written warnings, and letters of reprimand stating that her performance was inadequate. Hawkins submitted several responses and rebuttals.

Valencia and McIntosh provided a Final Evaluation of 90-Day Improvement Plan in February 2011 stating that Hawkins had failed to satisfy the plan's requirements in five of the six areas needing improvement. They also provided a performance evaluation in February 2011 evaluating her in only two areas, "subject matter knowledge" and "teaching strategies," stating that Hawkins' performance was unsatisfactory in both areas. The performance evaluation stated regarding "subject matter knowledge": "Subject matter is not made accessible to the resource students. Children are grouped together for guided reading groups despite disparities in levels. For example C.V. (RRR 12) is grouped with D.P. (RRR 4). There is no apparent objective posted, no congruency with pacing guides or grade level standards (prefixes/suffixes/character traits). Lessons are simply reading books with high levels of support such as, 'What's this word, (while pointing at a picture); What picture do you see here?; What's the man doing?; What's he cutting with?; Do you know the name of that?' No strategies were used to help the child become an independent reader. The teacher has not provided consistent instruction based on grade level standards and IEP goals."

The February 2011 performance evaluation stated regarding teaching strategies: "During guided reading lessons English Language Learner strategies are not used with EL students. The strategy used through the guided reading lessons was, 'sound it out.' The teacher did not use other reading strategies as appropriate for the learning levels of the students or to address the errors that the student made. The guided reading lesson format was not consistently followed. Book introductions did not take place and no specific teaching points were made. The lessons were not purposeful and did not reflect the use of assessment data. The texts did not appear to be previewed for lessons on phonics/word analysis etc. Texts were chosen at random without regard to students' needs. There was little, if any, prompting to encourage independent use of reading strategies. September to December, students read the same guided reading books without consideration of their growth or guided reading guidelines, which states that students should be introduced to a new guided reading book everyday at the beginning levels.

"There is grave concern about students' needs not being met. Students' reading levels were not matched to the appropriate guided reading level book. For example 4 of the 14 guided reading boxes in Mrs. Hawkins classroom are aligned with the students' reading level. Some books are not at the students' reading level. And in the worst case, there are students without books at their reading level. It appears that the three students reading at level 26 are matched to a reading level 23, which does not meet their educational needs."

Hawkins was placed on administrative leave. The District adopted a notice of intention to suspend and dismiss Hawkins on February 22, 2011, charging her with (1) immoral conduct, (2) unprofessional conduct, (3) willful refusal to perform, (4) unsatisfactory performance, and (5) evident unfitness for service. Hawkins requested a hearing before the Commission.

2. *Administrative Hearing*

The Commission conducting an evidentiary hearing in October 2011. Hawkins represented herself at the hearing. The Commission rendered a decision in December 2011 finding that there was no cause for dismissal.

The decision stated regarding the performance evaluation for the 2007-2008 school year: "As to Respondent's professionalism, it was not established that Respondent was failing to collaborate with the general education teachers, or anyone else. The District offered no testimony from any teacher who had a problem or issue with Respondent's ability to collaborate, or lack thereof. Dr. Grant's other critique, that Respondent's students appeared bored, was established. However, the students were bored because Respondent was utilizing the Systematic Instruction in Phoneme Awareness, Phonics, Sightwords (SIPPS) program which Dr. Grant herself described as 'highly scripted and very slow paced.' Thus, Respondent was merely teaching her students with the materials that the District had instructed Respondent to utilize. Dr. Grant's critique that Respondent was 'often late in arriving in the morning' and was late to staff meetings was not established by the evidence. It strains credibility to imagine that a teacher, namely Respondent, would be tardy when she had a nearly

8

perfect attendance record for 13 years, volunteered for 'Monday Morning Gate Duty,' and stayed until 9 or 10 p.m. on many workdays. . . . The other allegations as specified in the pleadings, as related to this school year, were not established by the evidence."

The decision stated regarding the performance evaluation for the 2008-2009 school year: "Again Respondent was critiqued for not communicating with other teachers concerning the progress of her RSP students. This critique was not established for the same reasoning as set forth in Factual Finding 6 [quoted *ante*]. The other allegations as specified in the pleadings, as related to this school year, were not established by the evidence."

The decision stated regarding the performance evaluation for the 2009-2010 school year that the District had established that Hawkins was not using the CELL/ExLL strategies as required by the District, and stated that she should have requested additional resources, training or assistance if necessary. It also stated that Hawkins should use graphic organizers, and stated that the other allegations specified in the pleadings were not established. The decision stated, however, that the District had failed to follow its own policy requiring a teacher who receives an "unsatisfactory" rating in "teaching strategies" to receive assistance from a consulting teacher. It stated that the District's failure to follow its own policy made the discipline imposed on Hawkins improper.

The decision stated regarding the 2010-2011 school year that Dr. Ybarra's instructions to Hawkins to complete all IEP goals and objectives within one month of the initial date of the IEP meeting and input all components of the IEP into the SEIS

9

computer program within three days of the IEP meeting were reasonable, but those requirements were inappropriate because the District had failed to provide her with a consulting teacher as required by its own policy.

The decision stated regarding the 90-Day Performance Improvement Plan, "Instead of including Ibarra's prior instructions to Respondent, the PIP required Respondent to 'sign and attest' all IEP reports immediately after the meeting and also required her to bring a pre-prepared IEP report to the IEP meeting using the SEIS computer program. These directives were more stringent than those recommended by Ibarra only two months earlier. Additionally, although the District was aware that Respondent was having difficulty with her workload, the District added additional Response to Intervention (RTI) students to her workload. The Commission finds that requiring Respondent to 'affirm and attest' all IEP reports on the same day of the IEP meeting is unreasonable, as is adding additional RTI students to Respondent's already heavy caseload. Further, having an IEP report almost completely filled out before the IEP meeting is unreasonable. The whole point of an IEP meeting is for the team members to discuss the student's specific needs, goals and objectives. As such, much of the IEP report can not be completed before the IEP meeting concludes, especially since meeting notes need to be added, goals require updating, some pages require signatures, and the team needs to be in agreement. . . . [] . . . In sum, the District's PIP was unreasonable and virtually ensured Respondent's failure."

The Commission's decision stated further: "Respondent could, in general, have been more assertive and communicative with the District regarding her need for

10

assistance. She could have been more open-minded to new teaching strategies and the use of a computer. She could have had a more positive attitude toward the implementation of the SEIS program. However, Respondent was submissive to the District's directives. That is, when she had a heavy caseload, she did not complain or ask for help. Instead, she worked late. Her workload was so heavy that when she was suspended her students were reassigned to two RSP teachers, rather than only one. When the District began issuing critical evaluations, she attempted to appease the District by attempting to perform the tasks they wanted done, no matter how difficult or unreasonable. While Respondent may not be a perfect teacher, it was undisputed that she deeply cared for her students and she tried to do her very best. The overall evidence established that the District did not follow its own policy and proactively try to assist Respondent. Instead, they asked her to perform in an almost physically impossible manner. It was established that the District did not have any basis to impose any discipline against Respondent. Any allegations stated in pleadings that are not discussed above were not established by the evidence."

3. *Trial Court Proceedings*

The District filed a petition for writ of mandate in January 2012 (Code Civ. Proc., § 1094.5) challenging the Commission's decision. Hawkins answered the petition, and the parties filed briefs on the merits. The trial court filed a 16-page tentative decision. After a hearing on the merits, the court adopted the tentative decision as its order, but declined to issue a statement of decision absent a timely

11

request. Exercising its independent judgment on the evidence in the record, the court found that there was no cause for dismissal.

The order stated that Hawkins did nothing that was immoral and that the District apparently had abandoned that charge. It stated that Hawkins did not willfully refuse to perform any task that she was directed to perform, but instead attempted to do what was asked of her and worked long hours to do so. It also stated, "[t]he term 'unprofessional conduct' means conduct establishing an unfitness to teach, usually involving incidents of extracurricular sexual or criminal activity, or use of sexually explicit teaching materials. [Citation.] Hawkins' failures were not of this variety. Her failures generally were those of not completing tasks, not performing tasks on a timely basis, not communicating and collaborating as required, not preparing and completing IEPs as directed. None of these failures was shown to be unprofessional."[1]

The order stated further, "To meet its burden of showing incompetency, the District was obligated to show that Hawkins was given multiple opportunities to perform the job (including aid from a Consulting Teacher), that she was simply unable to do the tasks assigned, and that those tasks were an important part of her job. The District has shown that Hawkins was given multiple opportunities and that she failed to complete certain tasks. It has not shown that she was given the aid of a Consulting Teacher. More important, the District has not shown how important these tasks were to

---

[1] The trial court did not separately discuss the charge of "evident unfitness for service" and instead considered that charge together with the charge of "unprofessional conduct."

the job. Without expert testimony on the significance of Hawkins' failures, the District has not shown incompetency."

The trial court therefore denied the District's petition and entered a judgment ordering the District to reinstate Hawkins as of October 1, 2012; pay her $136,003.30 in back pay, minus taxes and agreed-upon deductions; and credit her for accrued sick leave. The District timely appealed the judgment.

## *CONTENTIONS*

The District contends the evidence does not support the trial court's finding that there was no cause for dismissal and instead shows that Hawkins is evidently unfit to teach, willfully refused to perform her regular assignment, and committed unprofessional conduct.[2]

## *DISCUSSION*

1. *Legal Framework and Standard of Review*

A school district may dismiss a permanent employee only for one or more causes specified by statute. (Ed. Code, § 44932, subd. (a).) Among the causes for dismissal are "[i]mmoral or unprofessional conduct," "[u]nsatisfactory performance," "[e]vident unfitness for service" (*ibid.*) and "willful refusal to perform regular assignments without reasonable cause" (*id.*, § 44939). An employee receiving notice of the school district's intention to suspend or dismiss the employee is entitled to an evidentiary hearing before the Commission upon a timely request. (*Id.*, §§ 44934, subd. (a), 44944.) Two of the

---

[2] The District does not argue on appeal that the charges of immoral conduct and unsatisfactory performance should have been sustained.

13

three members of the Commission are required to be credentialed teachers with experience in the respondent teacher's discipline. (*Id.*, § 44944, subd. (b).) The Commission's decision whether to suspend or dismiss the employee or not to do so constitutes the final administrative decision. (*Id.*, § 44944, subd. (c)(1), (4).)

A party obtains judicial review of the Commission's decision by filing a petition for writ of mandate in the trial court. (Ed. Code, § 44945.) The trial court must exercise its independent judgment on the evidence in the record and determine whether the weight of the evidence supports the Commission's decision. (*Ibid.*; Code Civ. Proc., § 1094.5, subd. (c).) The Commission has experience and expertise in evaluating teachers' performance, and its findings are entitled to a strong presumption of correctness even under an independent judgment review. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817; *San Dieguito Union High School Dist. v. Commission on Professional Competence* (1982) 135 Cal.App.3d 278, 288.)

On appeal, we must sustain the trial court's factual findings if they are supported by substantial evidence in the record. (*Pasadena Unified Sch. Dist. v. Commission on Professional Competence* (1977) 20 Cal.3d 309, 314.) We may consider the findings in the final administrative decision for guidance in determining whether the trial court's judgment is supported by substantial evidence. (*Sandarg v. Dental Bd. of California* (2010) 184 Cal.App.4th 1434, 1440.) We resolve all conflicts in the evidence in favor of the party prevailing at trial and give that party the benefit of all reasonable inferences supporting the judgment. (*Pasadena*, *supra*, at p. 314.) If more than one inference can

14

reasonably be deduced from the facts, we cannot substitute our own deduction for that of the trial court.  (*Ibid.*)

> 2.  *Substantial Evidence Supports the Finding that Hawkins Is Not Evidently Unfit to Teach*
>
>> a.  *The District Failed to Establish Many of the Purported Shortcomings and Failures*

A teacher is evidently unfit for service within the meaning of Education Code section 44932, subdivision (a)(5) if he or she is " 'clearly not fit, nor adapted to or unsuitable for teaching, ordinarily by reason of temperamental defects or inadequacies.' . . . 'evident unfitness for service' connotes a fixed character trait, presumably not remediable merely on receipt of notice that one's conduct fails to meet the expectations of the employing school district." (*Woodland Joint Unified School Dist. v. Commission on Professional Competence* (1992) 2 Cal.App.4th 1429, 1444.) Although "immoral or unprofessional conduct" is also set forth as a cause for dismissal (Ed. Code, § 44932, subd. (a)(1)), such conduct can justify a dismissal only if it indicates an unfitness to teach.  Thus, the determinative test is fitness to teach.  (*Board of Education v. Jack M.* (1977) 19 Cal.3d 691, 696-697.)

The District argues that Hawkins's "pervasive failure to accept responsibility for her shortcomings as a teacher, her stubborn unwillingness to acknowledge her failures even in the face of uncontroverted and unambiguous evidence, and her unwillingness and reluctance to accept assistance to improve" indicate that she is clearly not fit, adapted to, or suitable for teaching.  Even if we assume arguendo that the conduct the

15

District describes would establish evident unfitness for service, there is contrary evidence in the record.

Hawkins disputed the criticisms in her performance evaluations both in her written rebuttals and in her testimony before the Commission. She testified that she instructed a large number of students with learning impairments, and that she was busy instructing students throughout the day and typically worked until 9:00 p.m. three days per week in order to complete the required reports. She testified that it was difficult to find time to meet with the general education teachers because the teachers were busy preparing for class in the mornings and she was busy instructing students during the school day, and she was never offered a substitute teacher on collaboration dates. She stated that she would call the teacher if she had a concern and that some teachers came to her. The District presented no teacher testimony supporting the claim of failure to collaborate and communicate.

Hawkins testified that she was never absent from Studebaker, having worked there since the 2003-2004 school year, and disputed the statement in the 2007-2008 performance evaluation that she was "rarely absent." She also disputed the statement that she was "often late to arrive in the morning and is frequently late to morning and afternoon staff meetings." She testified that she was late only on rare occasions when there was a major accident on the freeway, never missed her gate duty in the morning, was late for morning meetings only if she was on a phone call at the time, and was usually the first person to arrive to the afternoon meetings.

16

Hawkins disputed the statement that she failed to use CELL/ExLL instructional strategies, stating that she had incorporated those strategies but also had to address goals and objectives based on the weaknesses identified in her students. She disputed the criticism of her use of space in the classroom, stating that she shared the classroom with a speech therapist, the back door was kept locked requiring the students to come and go through a single door, and there were limitations on her use of space in the room.

Hawkins also disputed the statement that the materials she used were not aligned with the students' instructional levels, stating that she tested the students, formulated goals and objectives based on the results of the testing, and used instructional materials appropriate for those goals and objectives. She stated that her responsibilities as a special education teacher differed from those of a general education teacher, and yet she was being evaluated as if she were a general education teacher. She explained the reading strategies that she used and stated that the criticisms of her reading instruction were unfounded. Hawkins also presented testimony by teachers and a parent describing her as an effective teacher who was well-liked by her students and collaborated with other teachers.

Hawkins testified that her workload was heavy and that she did not have the time to complete some tasks and was frustrated at times. Although her 2009-2010 performance evaluation stated that she was required to receive assistance from a consulting teacher, there is no evidence that such assistance was offered to her.

The Commission's decision also supports the conclusion that many of the criticisms in the performance evaluations were unfounded. The Commission found that

17

the District failed to establish a failure to collaborate and communicate with the general education teachers and failed to establish that she often arrived late in the morning and was late to staff meetings. The Commission found that the District had established that Hawkins was not using the CELL/ExLL strategies as required. The Commission also found, however, that the District failed to follow its own policy requiring a teacher who receives an unsatisfactory rating in "teaching strategies" to receive assistance from a consulting teacher, and found that the 90-Day Performance Improvement Plan was unreasonable and "virtually ensured Respondent's failure." The Commission concluded that Hawkins "deeply cared for her students and she tried to do her very best," that she attempted to perform the tasks requested by the District "no matter how difficult or unreasonable," and that there was no cause for any discipline. The trial court, exercising its independent judgment, found that there was substantial evidence in the record to support the Commission's decision.

> b. *The Morrison Factors Do Not Compel the Conclusion that Hawkins Is Unfit to Teach*

The California Supreme Court in *Morrison v. State Board of Education* (1969) 1 Cal.3d 214 set forth a nonexclusive list of factors to consider in determining whether a teacher's conduct indicates that the teacher is unfit to teach (*Morrison* factors). Those factors are: "[1] the likelihood that the conduct may have adversely affected students or fellow teachers, [2] the degree of such adversity anticipated, [3] the proximity or remoteness in time of the conduct, [4] the type of teaching certificate held by the party involved, [5] the extenuating or aggravating circumstances, if any, surrounding the

conduct, [6] the praiseworthiness or blameworthiness of the motives resulting in the conduct, [7] the likelihood of the recurrence of the questioned conduct, and [8] the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers." (*Id.* at p. 229, fns. omitted.)

The District's analysis of the *Morrison* factors assumes that the evidence establishes all of the shortcomings and failures described in the performance evaluations. Our conclusion that there is substantial evidence to the contrary undermines the District's analysis. We conclude that the trial court, exercising its independent judgment, reasonably concluded based on substantial evidence in the record, consistent with the Commission's decision, that Hawkins was not evidently unfit to teach. Our consideration of the *Morrison* factors does not compel a contrary conclusion.

3.    *Substantial Evidence Supports the Finding that Hawkins Did Not Willfully Refuse to Perform her Regular Assignment*

The District argues that the same facts purportedly showing Hawkins's evident unfitness for service also show that she willfully refused to perform her regular assignment. It argues that the evidence shows that she consistently failed to accept and acknowledge criticism and failed to comply with the District's directives. We conclude that the evidence discussed *ante* constitutes substantial evidence that Hawkins did not willfully refuse to perform, but instead attempted to do what was required of her. The

19

trial court exercising its independent judgment reasonably so concluded, consistent with the Commission's decision.  The District has shown no prejudicial error in this regard.


### *DISPOSITION*

The judgment is affirmed.  Hawkins is entitled to recover her costs on appeal.


### *NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*



CROSKEY, J.

WE CONCUR:



KLEIN, P. J.



KITCHING, J.


20